through its registered agent C T Corporation System, 350 N. St. Paul St., Suite 2900 Dallas, Texas 75201.

188.    SSC Houston Southwest Operating Company, L.P. d/b/a Westchase Health and Rehabilitation Center located at 8820 Town Park Drive, Houston, Texas 77036.  It may be served through its registered agent C T Corporation System, 350 N. St. Paul St., Suite 2900 Dallas, Texas 75201.

189.    SSC Westchester Operating Company, L.L.C. d/b/a Westchester Health and Rehabilitation Center, located at 2901 S. Wolf Road, Westchester, Illinois 60154.  It may be served through its registered agent C T Corporation System, 208 S. LaSalle St., Suite 814, Chicago, Illinois 60604.

190.    SSC Wilmington Operating Company, L.P. d/b/a Wilmington Health and Rehabilitation Center, located at 820 Wellington Avenue, Wilmington, North Carolina 28401.  It may be served through its registered agent C T Corporation Company, 150 Fayetteville St., Box 1011 Raleigh, North Carolina 27601.

191.    SSC Alvin Operating Company, L.P. d/b/a Winchester Lodge Healthcare Center, located at 1112 Smith Drive, Alvin, Texas 77511.  It may be served through its registered agent C T Corporation System, 350 N. St. Paul St., Suite 2900 Dallas, Texas 75201.

192.    SSC Windsor Operating Company, L.L.C. d/b/a Windsor Healthcare Center, located at 710 3rd St., Windsor, Connecticut 80550.  It may be served through its registered agent The Corporation Company, 1675 Broadway Ste. 1200, Denver, Colorado 80202.

193.    Yuma Operating Company, L.L.C. d/b/a Yuma Life Care Center, located at 323 W 9th Avenue, Yuma, Colorado 80759.  It may be served through its registered agent The Corporation Company, 1675 Broadway Ste. 1200, Denver, Colorado 80202.

194.    All the affiliated facilities listed above will hereinafter be collectively referred to as the "Affiliated Facilities."

### III.    RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

195.    Any and all acts alleged herein to have been committed by the Defendants Sava, the Affiliated Facilities, and Woodwind Lakes were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies.

196.    Defendants Sava, the Affiliated Facilities and Woodwind Lakes are related entities sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior.    Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

### IV.    JURISDICTION AND VENUE

197.    Jurisdiction and venue are proper in this Court pursuant to the False Claims Act (31 U.S.C. § 3732(a)) because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729 in the United States by the defendant, some of which, upon information and belief, occurred in the Southern District of Texas, and because, based on information and belief, the defendant transacts other business within the Southern District of Texas.

198.    All of the named defendants are subject to the general and specific personal jurisdiction of this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1367.in that the claims

for relief in this action are brought on behalf of the United States for multiple violations of 31 U.S.C. §3739.

## V. STATUTORY BACKGROUND

### A. Introduction to Skilled Nursing Care Facilities

#### 1. Definition of Skilled Nursing Care

199.     The Centers for Medicare and Medicaid Services ("CMS") define skilled nursing care as the care which requires the skills of professional personnel such as licensed practical nurses, physical and occupational therapists and speech-language pathologists or audiologists. The skilled care is required on a daily basis and can only be provided in a Skilled Nursing Facility on an inpatient basis. See 42 C.F.R. § 424.20(a)(i).

#### 2. Facilities that Provide Skilled Nursing Care

200.     Skilled Nursing Care Facilities ("SNFs") are long-term care facilities, or nursing homes or sections of larger facilities that provide skilled nursing care to patients with serious health problems that require skilled nursing services, such as rehabilitative therapy, which encompasses physical, speech and occupational therapy.  SNFs are certified, operated, and reimbursed for patient care, according to the various Medicare and Medicaid laws and regulations governing and regulating SNFs.  As explained below, Medicare covers the "skilled nursing care" provided to nursing home patients whereas Medicaid covers the "custodial care" provided.  Facilities that are only certified under Medicaid, which are rare, are referred to as "Nursing Facilities."  SNFs with both certifications are inspected and licensed by the various States' departments of health services.

201.     Patients may not stay in a SNF's skilled nursing section for the entire length of their recovery from whatever illness or accident that first necessitated the need for skilled

nursing care. Once the medical personnel providing the skilled nursing care determine that the patient no longer requires, or will no longer benefit from the care, the patient is discharged from the skilled nursing care. At this point, the patient may either leave the facility or transfer to "custodial care." Custodial care is the (unskilled) care provided to a patient to assist with daily activities that most people are able to do themselves, such as getting in and out of bed, eating, bathing, and dressing.

**B.    Medicare Reimbursement for Skilled Nursing Care**

    **1.    Overview of the Medicare Program**

202.    The Medicare Program, established in 1965 by Title XVIII of the Social Security Act, is the federal program that provides hospital coverage for Americans who are sixty-five years of age or older and long-term disabled persons. *See* 42 U.S.C. § 1395 *et seq.* The United State Department of Health and Human Services, through its agency, CMS, is responsible for administering the Medicare programs. CMS contracts with private companies in each state known as intermediaries to administer Medicare Part A and carriers to administer Medicare Part B. Trailblazer Health Enterprises, LLC located in Dallas, Texas, is the Medicare intermediary and carrier for the State of Texas.

203.    Under 42 U.S.C. § 1395y(a), Medicare will not make any payments for services, including those provided by skilled nursing facilities, that are not reasonable and necessary for the diagnosis and treatment of illness or injury.

    **a.    Medicare Part A Reimbursement for Skilled Nursing Care**

204.    Medicare Part A covers the nursing care provided in skilled nursing facilities under certain limited conditions. First, Medicare Part A does not cover long-term nursing care that is classified as custodial care, as described above, rather than as skilled nursing care.

205. Second, in order for Medicare Part A to cover skilled nursing care, the care must be provided at a certified skilled nursing facility, or a designated wing of a long-term care facility or hospital for skilled nursing or rehabilitative services, following a *qualifying hospital stay*. A qualifying hospital stay is determined by the length of time a patient spends in a hospital just prior to entering a skilled nursing facility. The minimum qualifying hospital stay is three days. Further, the patient must enter the SNF within a short period of time after leaving a hospital.

206. Importantly, the patient must need the skilled services for the medical condition that was treated during the qualifying hospital stay or started at the SNF when the patient was being treated for that medical condition. The skilled services must be reasonable and necessary for the diagnosis or treatment of that medical condition.

207. In addition, as a condition of Medicare payment, the services must be ordered by a doctor. The doctor must certify that the initial care is needed and must recertify the continuation of that care. The care must require the skills of professional health personnel, and must be furnished by or under supervision of those skilled personnel. See 42 C.F.R. §§424.10 & 424.20 (2010).

208. Finally, the patient must have days that are available to be used left in his or her "benefit period," which is the means by which Medicare tracks the number of days of care available to a particular patient. A benefit period begins on the day the patient is admitted to the hospital or SNF under Medicare Part A and includes 100 days of coverage. Once the patient receives care for the 100 days, the benefit period ends. In order to qualify for another benefit period, a patient must have another minimum qualifying three-day hospital stay and meet the

other requirements discussed above. There is no limit to the number of benefit periods available to a patient.

209.     Medicare Part A covers 100 percent of the medical services provided, including pharmaceuticals, in the first twenty days of a benefit period. On the twenty-first day, Medicare Part A covers only eighty percent of the medical services provided, and Medicaid or TRICARE/CHAMPUS/CHAMPVA covers the remaining twenty percent if the patient is an eligible beneficiary under either of these programs. For calendar year 2011, the average amount of the remaining twenty percent was $141.50 per day. MEDICARE PAYMENT ADVISORY COMMISSION REPORT TO THE CONGRESS MEDICARE PAYMENT POLICY (March 2011) at 149.

210.     According to CMS, SNFs must be in compliance with the requirements of 42 C.F.R. Part 483, Subpart B, in order to receive payment under Medicare or Medicaid. The basis for these regulations is the federal 1987 Omnibus Budget Reconciliation Act ("OBRA '87"). OBRA '87 applies to long-term care facilities that receive Medicare or Medicaid funding. OBRA '87's intent is that a resident should not decline in health or well-being as a result of the way in which a nursing facility provides care.

211.     Title 42 C.F.R. Part 483, Subpart B contains the requirements that long-term care facilities, including skilled nursing facilities, must meet in order to participate in the Medicare program. Facilities must offer nursing, physician services, specialized rehabilitative services, and pharmacy services. Among the many requirements delineating the services that must be provided to residents is the requirement under 42 C.F.R. § 483.75(b) that a facility must be in compliance with "all applicable Federal, State and local laws, regulations, and codes and with accepted professional standards and principles that apply to professionals providing services in such a facility."

212. Patients who are eligible for Medicare Part A coverage typically make up a small percentage of a facility's total population but account for a disproportionate share of the reimbursement received. On average in 2009, Medicare Part A covered patients' stays accounted for twelve percent of the total of all patients' stays, but those days resulted in a full twenty-three percent of the facility revenue. MEDICARE PAYMENT ADVISORY COMMISSION, REPORT TO THE CONGRESS MEDICARE PAYMENT POLICY (March 2011) at 149.

### b. Medicare Part B

213. Medicare Part B provides coverage for services from physicians, non-physician practitioners, laboratories and suppliers and outpatient hospital services. Unlike Medicare Part A, wherein eligible beneficiaries are automatically enrolled to receive coverage once reaching the age of sixty-five, Medicare Part B beneficiaries must enroll in the program and pay a monthly premium. A provider uses CMS's 1500 Form claims sheet to submit its claims for reimbursement.

214. Medicare requires direct billing by the provider in order to reimburse for the services. As established in 42 U.S.C. § 1395(a)(1)(D), Medicare payment for such services is always the lowest of: the applicable local fee for a geographic area, the national limitation amount, or the actual amount billed. The local fee for a geographic area is the fee schedule established by intermediaries throughout the United States based on fees and payment levels that Congress annually determines during the budget process.

## C. Medicaid Reimbursement for Skilled Nursing Care

### 1. Overview of the Medicaid Program

215. Medicaid was established by the Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396 *et seq.* (2000). It is a joint federal-state program that provides healthcare benefits to certain demographic groups, particularly the poor and disabled.

216.    Within broad national guidelines established by federal statutes, regulations and policies, each state (i) establishes its own eligibility standards; (ii) determines the type, amount, duration, and scope of services; (iii) sets the rate of payment for services; and (4) administers its own program.  Most states reimburse nursing homes with a prospective payment system similar to Medicare.

### 2.    Medicaid Reimbursement for Skilled Nursing Care

217.    Medicaid coverage includes skilled nursing care, long-term care, and nursing home care, for eligible individuals.  To be eligible for Medicaid assistance with the costs of nursing home care, individuals must have limited assets, and must contribute all of their available income toward the cost of that care.

218.    Unlike Medicare, Medicaid covers custodial care provided to patients in long-term care or nursing home facilities.  Staff providing custodial care in these facilities will assist patients with daily activities such as dressing and eating, as more fully explained above.

219.    Nineteen percent of Medicaid recipients are defined as "dual eligible."  Dual eligibles are recipients who have Medicare coverage but also have such low incomes and limited resources that they also qualify for Medicaid benefits.  Because Medicaid is a "payer of last resort," dual eligible patients' Medicare coverage is supplemented by services available under their state's Medicaid program.

220.    When a dually eligible patient reaches the twentieth day of skilled nursing care, Medicare coverage decreases from 100 to eighty percent of the cost of skilled nursing care services, and Medicaid pays the remaining twenty percent of the cost of services until the 100th day of service is reached.  Once the 100th day of service is reached, the patient has exhausted his or her Medicare benefits for skilled nursing care for that particular benefit period, as more fully

explained above. From the 101st day onward, if the person is Medicaid eligible, Medicaid pays 100% of the costs of staying at the SNF.

## D. TRICARE/CHAMPUS/CHAMPVA Reimbursement for Skilled Nursing Care

### 1. Overview of TRICARE/CHAMPUS/CHAMPVA Programs

221. The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") and TRICARE, a continuation of CHAMPUS, are federally funded uniformed services health care programs for active duty and retired service members, members of the National Guard and Reserve, service members' families, survivors of service members, and certain former spouses of service members.

222. The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA"), is a federally funded healthcare program for the families and survivors of veterans who have been rated permanently and totally disabled for a service-connected disability and for the survivors of a military member who died in the line of duty, not due to misconduct.

### 2. TRICARE/CHAMPUS/CHAMPVA Reimbursement for Skilled Nursing Care

223. Medicare Part A becomes the primary payor when a beneficiary is eligible for benefits under both CHAMPUS/CHAMPVA and Medicare Part A. CHAMPUS/ CHAMPVA supplements Medicare Part A by paying portions of the bill not covered by Medicare. Thus, when a patient with both Medicare and CHAMPUS/CHAMPVA coverage in a skilled nursing facility reaches the twenty-first day of Medicare Part A coverage, CHAMPUS/CHAMPVA will cover the twenty percent no longer covered by Medicare Part A.

## E. Prohibition of Kickbacks Associated with Medicare

### 1. Federal Anti-Kickback Statute

44

224.     The Medicare-Medicaid Anti-Fraud and Abuse Amendments, known as the Medicare Anti-Kickback Statute ("Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b(b), make it illegal for an individual knowingly and willfully to offer or pay remuneration in cash or in kind to induce a physician to order a good or service that is reimbursed by a federal healthcare program. *See* 42 U.S.C. § 1320a-7b(b)(2).

225.     Specifically, in pertinent part, the Anti-Kickback Statute provides:

(b) Illegal remuneration

> 1. whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
>> (A)  in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>
>> (B)  in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

> 2. whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
>> (A)  to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>
>> (B)  to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

45

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Those who violate the statute also are subject to exclusion from participation in federal health care programs, and civil monetary penalties of up to $50,000 per violation and up to three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

226. "Remuneration" is broadly defined to include anything of value offered or paid in return for purchasing, ordering, or recommending the purchase or order of any item reimbursable by a federal healthcare program. Pursuant to the Patient Protection and Affordable Care Act, a violation of the Anti-Kickback Statute is a false or fraudulent claim for purposes of the FCA. See P.L. 111-148, § 6402, codified as 42 U.S.C. § 1320a-7b(g).

227. The purpose of the Anti-Kickback Statute is to prohibit such activities in order to secure proper medical treatment and referrals and to limit unnecessary treatments, services, or goods that are based not on the needs of the patient but on improper incentives given to others, thereby limiting the patient's right to choose proper medical care and services. *See* Medicare and Medicaid Programs; Fraud and Abuse OIG Anti-Kickback Provisions, 54 Fed. Reg. 3088, 3089 (proposed Jan. 23, 1989) (to be codified 42 C.F.R. pt. 1001).

228. Paying kickbacks taints an entire claim. The kickback inherently interferes with the doctor-patient relationship and creates a conflict of interest, potentially putting the patient's health at risk. Any defendant convicted under the statute is automatically barred from participating in federal and federally-funded healthcare programs.

**F.     Medicare Enrollment Certification**

229. To participate in Medicare, providers must first sign enrollment agreements. These agreements require providers to certify that they understand that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with . . . the Federal anti-kickback statute."

## G. Cost Reports Certifications

230. Furthermore, Medicare and Medicaid require skilled nursing facilities to submit regular, detailed cost reports accounting for their assets, transactions, and costs. Skilled nursing facilities use HCFA form 2540-96 or 2540-10 to submit their cost reports. The forms contain the following certification language:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL, AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT MAY RESULT.

> I hereby **certify** that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted **cost report** and the Balance Sheet and Statement of Revenue and Expenses prepared by [provider name and number] for the **cost reporting period** beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further **certify** that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this **cost report** were provided in compliance with such laws and regulations.

Form 2450-96, furthermore, expressly states the consequences of a failure or refusal to certify:

> This report is required by law (42 U.S.C. § 1395g; 42 C.F.R. 413.20(b)). Failure to report can result in all interim payments made since the beginning of the cost reporting period being deemed overpayments (42U.S.C. § 1395g).

## H. Other Medicaid Certifications

47

231.    Providers such as the Affiliate Facilities make express and/or implied certifications in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid.  The following are representative samples of the types of certifications health care providers make when entering Medicaid Provider Agreements with the State Medicaid programs:

232.    When a provider enters into the "Medi-Cal Provider Agreement" with the State of California's Health and Human Services Agency, the provider agrees under the Provider Attestation section that "compliance with the provisions of this agreement is a condition precedent to payment to the provider."    Medi-Cal Provider Agreement, Item 40 Provider Attestation,    at    8,    http://files.medi-cal.ca.gov/pubsdoco/provappsenroll/o2enrollment_ DHCS6208.pdf and incorporated herein).  The agreement's provisions include the provider's obligation to comply with the California Department of Health Care Services' rules, regulations and provisions found in Chapters 7 and 8 of the Welfare and Institutions Code as well as all federal laws and regulations governing and regulating Medicaid providers.  _Id_. at 1, Item 2. Furthermore, the provider agrees not to engage in or commit fraud or abuse including fraud under applicable federal or state laws and abuse that would result in unnecessary costs to health care programs financed in whole or in part by the Federal Government or any state or local agency in California or any other state, or practices that are inconsistent with sound medical practices that result in reimbursement from health care programs financed in whole or in part by the Federal Government or any state or local agency in California or any other state. _Id_. at 3, Item 15.  Under Item 19 - Prohibition of Rebate, Refund or Discount, the provider agrees "not to offer, furnish or deliver any rebate, refund, preference. . .or other gratuitous consideration in connection with the provision of health care services. . .or to take any other action or receive any

48

other benefit prohibited by state or federal law." _Id._ at 4, Item 19. Finally, the provider agrees to comply with the Welfare and Institutions Code billing and claims requirements, its implementing regulations and the provider manual. _Id._ at 4, Item 24.

233. The Colorado Medicaid Assistance Program "Provider Participation Agreement" requires the provider to "comply with applicable provisions of the Social Security Act, as amended; federal or state laws, regulations, and guidelines and Department rules." Provider Participation Agreement, Item A – Provider Participation, at 15, http://www.colorado.gov/cs/Satellite/HCPF/HCPF/1197969485906, and incorporated by reference herein. Under Item K, the provider and person signing the claims or submitting electronic claims understand that: "[T]he knowing submission of false claims or causing another to submit false claims may subject the persons responsible to criminal charges, civil penalties, and/or forfeitures." _Id._ at 16. Moreover, the "Provider Signature Page" states that by executing Colorado's Provider Agreement, the provider understands "that any false claims, statement, documents, or concealment of material fact may be. . . prosecuted under applicable federal and state laws." _Id._ at 20.

234. The State of Connecticut requires providers to enter into a "Health Care Financing Provider Enrollment Agreement" with the Department of Social Services ("DSS"). By signing the contract, the provider agrees to abide by and comply with DSS's rules, regulations, policies and procedures as well as all federal and state statutes, regulations, and policies pertaining to Provider's participation in the Connecticut Medical Assistance Program. Health Care Financing Provider Enrollment Agreement, Items 1-2, General Provider Requirements, www.ct.gov/.../exhibit_1_dss_medicaid_provider_enrollment_agreement and incorporated by reference herein. Furthermore, the provider's submission of any claim for payment will

49

constitute certification by the provider that the items and services for which the claim for payment is submitted were in compliance with the DSS rules, regulations, and policies, including certification that the services were actually provided and medically necessary. Id., Item 15, Billing/Payment Rates.

235. In Georgia, a health care provider signs the State "Department of Community Health Division of Medical Assistance Statement of Participation" and agrees to abide by the applicable provisions of the Georgia State Medicaid Program as set forth in Title XIX of the Social Security Act of 1935, as amended, and O.C.G.A. § 49-4-1 *et seq.* Department of Community Health Division of Medical Assistance Statement of Participation, at 1, https://www.mmis.georgia.gov/portal/Portals/0/Static/Content/Public/ALL/FORMS/Stmt_of_Par ticipation%2013-02-2012%20212352.pdf, and incorporated by reference herein.

236. Under the Illinois "Agreement for Participation Illinois Medical Assistance Program," a provider who wishes to submit claims for services rendered to eligible Healthcare and Family Services clients agrees, on a continuing basis, to comply with "Federal standards specified in Title XIX and XXI of the Social Security Act and with all other applicable Federal and State laws and regulations." State of Illinois Department of Healthcare and Family Services Agreement for Participation Illinois Medical Assistance Program, Item 3, at 1, http://www.hfs.illinois.gov/assets/hfs1413.pdf, and incorporated by reference herein. Moreover, the provider agrees "to be fully liable for the truth, accuracy and completeness of all claims submitted…to the Department for payment." *Id.* at 1, Item 6. Additionally, the Provider acknowledges that all services provided will be in compliance with such laws and the applicable provisions of the Illinois Healthcare and Family Services Medical Assistance Program handbooks and that such compliance is "a condition of payment for all claims submitted." *Id.*

The provider further agrees that "[A]ny submittal of false or fraudulent claim or claims or any concealment of a material fact may be prosecuted under applicable Federal and State laws." *Id.*

237. The State of Maryland requires providers to agree the State Department of Health and Mental Hygiene's "Provider Agreement for Participation in Maryland Medical Assistance Program (MMAP). By signing the contract, the provider agrees to abide by and comply with MMAP rules, regulations, policies and procedures as well as all federal and state statutes, regulations, and policies pertaining to Provider's participation in the Maryland Medical Assistance Program. Provider Agreement for Participation in Maryland Medical Assistance Program, Item A, https://mmcp.dhmh.maryland.gov/docs/Provider_ Agreement_Signed.pdf, and incorporated by reference herein. Furthermore, the provider's submission of any claim for payment will constitute certification by the provider that the items and services for which the claim for payment is submitted were in compliance with Department rules, regulations, and policies, including certification that the services were actually provided and medically necessary. *Id.*, Item J.

238. In Massachusetts, laboratory clinical services providers sign agreements with MassHealth, the Massachusetts Medicaid program. Massachusetts regulations state that "all independent clinical laboratories participating in MassHealth must comply with the regulations governing MassHealth, including but not limited to MassHealth regulations set forth in 130 CMR 401.000 and 450.000." 130 CMR 401.401.

239. Michigan requires providers to sign similar agreements expressing commitment to abide by and comply with all federal and state statutes and rules relating to the delivery of services to individuals and the submission of claims for such services under the State Medicaid Program.

240. Under North Carolina's "Provider Administrative Participation Agreement," a provider may submit claims to the state Medicaid program either through electronic or paper claims submission process. In consideration for the right to submit paperless claims, the provider agrees to "abide by all Federal and State statutes, rules, regulations and policies…of the Medicaid program . . . ." By submitting electronic claims, the provider agrees that "[A]ny false statement, claims or concealment of or failure to disclose a material fact may be prosecuted under applicable federal and/or state law (P.L. 95-142a and N.C. G.S. 108A-63) . . . ." _North Carolina Medicaid Provider Enrollment Agreement, Electronic Claims Submission (ECS) Agreement,_ at 1, Items 1 and 2, https://www.nctracks.nc.gov/provider/ providerEnrollment/LoginAction?SessionIndex=begin,=, and incorporated by reference herein. Additionally, the provider agrees when filing non-electronic Medicaid claims, that "payment of claims will be from federal, state and local tax funds and any false claims, statements, or documents or concealment of a material fact may be prosecuted under applicable Federal and State laws . . . ." _Id._

241. In Tennessee, a provider enters the State of Tennessee's "Department of Finance and Administration Provider Participation Agreement Medicaid/TennCare Title XIX Program" in order to participate in the Tennessee Medicaid health care program. By signing the agreement, the applicant agrees to, among other things, "comply with all contractual terms and Medicaid policies as outlined in Federal and State rules and regulations and Medicaid provider manuals and bulletins." _State of Tennessee The Department of Finance and Administration Provider Participation Agreement Medicaid/TennCare Title XIX Program,_ at 1, Item 7, http://www.tn.gov/tenncare/forms/mcchoices.pdf, and incorporated by reference herein.

242.     In the State of Texas, Medicaid Provider Enrollment Application providers certify that "concealment of a material fact, or pertinent omissions may constitute fraud and may be prosecuted under applicable federal and state law." Texas Medicaid Provider Enrollment Application, at 6.5, http://www.tmhp.com/Provider_Forms/Provider%20Enrollment/ Texas%20Medicaid%20Provider%20Enrollment%20Application.pdf, and incorporated by reference herein. Providers further certify that "any falsification, omission, or misrepresentation in connection with…claims filed may result in all paid services declared as an overpayment and subject to recoupment." Id. Providers also certify that they will comply with the requirements of the enrollment agreement, including "federal laws and regulations relating to fraud, abuse and waste in health care and the Medicaid program." Id. at 6.2, 6.5. The Texas Medicaid enrollment agreement requires signatories to notify the State of Texas if they fall out of compliance with any of their obligations. Id.

243.     In Wisconsin the "Provider Agreement" is a contract between a provider and the Wisconsin Department of Health Services that sets forth conditions of participation and reimbursement. The provider's signature signifies acknowledgement that any statement or representation of a material fact made or caused to be made in the application or during the process "for a benefit or payment or made for the use in determining rights to such benefit or payment" that is false as defined by s.49.49(1) or (4m) of the Wisconsin statutes subjects the provider to criminal or other penalties." Wisconsin Medicaid Provider Agreement and Acknowledgement of Terms of Participation, at 3, https://www.forwardhealth.wi.gov/WIPortal/ Tab/42/icscontent/pdf/certPackets/physician.pdf.spage, and incorporated by reference herein.

I.     **Medicaid Reimbursement**

53

244.     As stated above, after 20 Medicare days, patients dually eligible for Medicare and Medicaid begin to have their care covered by 80% Medicare, 20% Medicaid. Reimbursement after Medicare expires varies by state. Within broad national guidelines established by federal statutes, regulations, and policies, each state: (i) establishes its own eligibility standards; (ii) determines the type, amount, duration, and scope of services; (iii) sets the rate of payment for services; and (4) administers its own program.

245.     Pursuant to 42 U.S.C. §§ 1396(a), a state's payment methodology shall be set forth in each state's Medicaid State Plan, and must be approved by the Centers for Medicare and Medicaid Services (CMS). States are allowed to amend their state plans; however any amendment must first also be approved by CMS. Additionally, many states codify their methodologies in their administrative codes and state statutes.

246.     The twenty states in which Sava currently has homes set reimbursement rates based on cost. In a cost-based system, rates are established prospectively, based on the facilities reported costs. New rates are set each year using actual costs from the prior year, or are usually inflated from a selected previous year's cost.

247.     There are two different approaches to the prospective methodology: acuity-based systems, and systems that do not account for acuity. For the acuity-based approach, the per diem rate is calculated by adjusting the direct care cost component for the patient's acuity. The other approach does not consider the acuity of the resident in setting rates. Nevertheless with either approach, the overall per diem rate that a facility is paid is also impacted by supplemental payments for additional services, and peer groupings whereby similarly situated facilities are arrayed based on like-costs, number of beds, geography, and/or occupancy rate standards.

Case 3:15-cv-01102   Document 40-1   Filed 07/30/15   Page 19 of 40 PageID #: 439

248.    States that classify patients based on acuity are referred to as "Case-Mix States." "Case-mix reimbursement" refers to a payment system that reimburses each facility according to the amount of resources consumed while treating its case-mix of Medicaid residents according to their level of care. Under a case-mix system, lighter care Medicaid residents lead to a lower payment rate than residents needing higher care.

249.    The per diem payment for Medicaid residents is determined by the average Case Mix Index ("CMI") for the facility. There are several approaches to case-mix methodology for payments to skilled nursing facilities. States may elect to adopt the resource utilization groups system (RUG-III), employed by the federal government pursuant to Title XVIII of the Federal Social Security Act (Medicare). The RUG classification system uses information from the Minimum Data Set (MDS), a component of the federally mandated Resident Assessment Instrument, to classify residents into groups according to their needs. Alternatively, states may choose to adopt their own state-classifications based on the patient's level of care.

250.    Sava owns homes in twelve states that currently use the RUG system and one state that uses its own classification systems. The remaining six states do not classify their patients for purposes of determining the direct care component based on patient's acuity level, yet there is room to abuse the system, for instance by misrepresenting direct care costs, within this component, without the need to adjust for acuity. Additionally, most states utilize an occupancy rate to determine the payout rate. Facilities that meet the occupancy standard are paid at a higher rate than facilities that do not meet the occupancy standard, creating incentives to misrepresent or manipulate occupancy rates.

251.    Additionally, most states provide supplemental reimbursement to patients with special needs, such as patients with ventilator-use, or behavioral problems. In states that use

55

RUG, these needs are similarly indicated using the patient's RUG classification, and documented through a separate system. States that do not use RUG also allow add-ons and supplemental payments. Thus, it may be possible that supplemental payments are received based on misrepresentation of patient's direct care needs.

252.    The most common case-mix classification system used to determine acuity is the "Resource utilization groups" or RUG. RUG refers to the system for grouping a nursing facility's residents according to their clinical and functional statuses as identified from data supplied by the facility's minimum data set (MDS).

253.    There are currently 34 states using RUG. The RUG level is used to calculate the per diem rate, specifically the direct patient care cost component of the rate. There are several versions of RUG, all employing a different number of patient classification groups to classify residents into a certain classification corresponding to their conditions and the resources required for care. The most commonly used version is the RUG III, 34 grouper; however, states also use 44 grouper, 53-grouper model, or other successor RUG models (RUG IV).

254.    Before RUG III and RUG IV models were implemented, states used the RUG II system. Many states have since opted to use RUG III, as RUG III utilizes data from the federally mandated[1] Minimum Data Set (MDS) to assess and classify the patient. The MDS is completed using the Resident Assessment Information, and is transmitted to CMS via the Minimum Data Set (MDS). 42 C.F.R. § 483.20. Most states have elected to implement a RUG reimbursement system in order to utilize the MDS data previously collected.

1.    **States Employing the RUG Classification System**

**Colorado**

---

[1] 42 C.F.R. § 483.20

255.    Colorado's Medicaid agency, the Department of Health Care Policy & Financing,

classifies all nursing home residents using version 5.12b of the Resource Utilization Groups-III

(RUG-III), 34-grouper model, using the index-maximization option, as developed by the Centers

for Medicare and Medicaid Services (CMS). 10 Colo. Code Regs. § 2505-10:8.443.6 (West

2015). Colorado calculates two average case-mix indices for each Medicaid nursing facility: one

index for all residents in the facility; and one index for all residents where Medicaid is the

primary payer source. *Id.*

**Georgia**

256.    In Georgia, all nursing home residents are classified using the Resource

Utilization Groups-III (RUG-III), 34-grouper model as developed by the Centers for Medicare

and Medicaid Services (CMS). Georgia State Plan Amendment, Attachment 4.19-D, Supplement

3,                                          at                                          5,

http://dch.georgia.gov/sites/dch.georgia.gov/files/related_files/document/State_Plan_Attachment

_4.pdf.

**Illinois**

257.    Formerly, Illinois employed a state-specific, case-mix classification system.

However, effective in 2015, the state of Illinois classifies their nursing facility residents using

Resource Utilization Groups.

**Maryland**

258.    Effective in 2015, the state of Maryland classifies their nursing facility residents

using Resource Utilization Groups IV (RUG IV), 48-grouper, as developed by the Centers for

Medicare and Medicaid Services (CMS). Md. Code Regs. 10.09.10.11-7 (West 2015). *See also*

Letter from Mark Leeds, Director of Long Term Services and Support, Maryland Department of

57

Health and Mental Hygiene, to Nursing Home Administrators, (February 26, 2016), available at https://mmcp.dhmh.maryland.gov/longtermcare/siteassets/sitepages/nursing%20facility%20providers/shadow%20rate%20letter%202.26.14.pdf.

259. Using a prospective, cost-based methodology to calculate the reimbursement rate, Maryland formerly employed a state-specific, case-mix classification system based on case-mix weights corresponding to the Activities of Daily Living (ADLs). *See* Figure 1. Residents were assessed using an ADL classification based on the dependency of the resident in five activities of daily living: (1) Bathing; (2) Dressing; (3) Mobility; (4) Continence; and (5) Feeding. Md. Code Regs. 10.09.10.11 (West 2015). Each resident was then assigned to a designated level of care depending on the resident's degree of dependency in ADLs. *Id.* The main four reimbursement levels were: Light; Moderate; Heavy; Heavy Special. *Id.*

**Massachusetts**

260. In the state of Massachusetts, Medicaid is administered by the Executive Office of Health and Human Services and is referred to as MassHealth. MassHealth's fee for service delivery system has traditionally employed a case-mix methodology using its own state classification. Nevertheless, prior to employing RUG and MDS, Massachusetts uses an acuity-based method entitled Management Minutes. To receive MassHealth reimbursement, a nursing facility must complete a Management Minutes Questionnaire (MMQ) to determine the amount of care that a patient requires. Like the MDS for RUG, the MMQ is used to place the patient into a case-mix classification.

261. Based on the information provided in the MMQ recorded through the nurse's documentation, the member is assigned to one of ten Management Minutes Categories (MMC).

58

Each category corresponds to a different rate of payment. MassHealth pays for nursing-facility services based on the rates that correspond to the nursing-care needs of members in the facility.

262. **MMQ Submission:** Ultimately, the long-term care facility receives reimbursement from Medicaid/MassHealth based on the information that is contained in the MMQ form. All MMQs claims must be medically necessary. Instructions for Completing Initial and Semiannual Management Minutes Questionnaires (MMQs), Commonwealth of Massachusetts Division of Medical Assistance Provider Manual Series, Nursing Facility Manual, at E-3, http://www.mass.gov/eohhs/docs/masshealth/providermanual/appx-e-nur.pdf

263. Initially, a MMQ must be submitted for each new MassHealth member at the end of 30 days from the admission date, and semiannually thereafter for all MassHealth members. *Id.* at E-1. In addition to the MMQ, a licensed nursing summary must be completed every month to ensure accuracy and objectivity. *Id.* at E-3. This monthly report must be completed by a licensed nurse who provided direct member care, and shall summarize all of the care provided to the member and. *Id.* Most importantly, the licensed nurse who completes the monthly nursing summary cannot complete the MMQs. The MMQ must be completed by a different licensed nurse (RN, LPN) and must be signed by a registered nurse. *Id.*

264. Nevertheless, Massachusetts is currently in the process of transitioning to RUG system, which employs MDS. Thus, effective October 1, 2015, Massachusetts will no longer use MMQ.

265. **Claim Submission:** As with all states, Medicaid is the payor of last resort. Providers must use due diligence to seek payment from all other providers before submitting a claim to MassHealth. 130 Mass. Code Regs. 450.316 (West 2015). When a member's stay is covered by Medicare, the facility does not need to complete an MMQ. *Id* .at E-1. Thus, when

59

Case 3:15-cv-01102   Document 40-1   Filed 07/30/15   Page 24 of 40 PageID #: 444

Medicare coverage ends, if the member is eligible for conversion to MassHealth, the facility must submit an MMQ for conversion with an effective date of the first day of MassHealth eligibility. *Id.*

**Mississippi**

266.    For nursing facility reimbursement, the Mississippi Division of Medicaid (DOM) utilizes the M3PI calculator, which is a *modified* version of the RUGs-III 34 grouper model. Code Miss. R. 23-207:2.10. The Mississippi M3PI consists of thirty-four (34) total groups, and uses the same grouper methodology as the CMS RUGS-III 34 grouper. Mississippi State Plan Amendment, Attachment 4.19-D, at 89, https://www.medicaid.ms.gov/wp-content/uploads/2014/01/SPA2010-027.pdf. Like RUG, each of the thirty-four (34) resident classifications is assigned a case-mix weight. R. 23-207:2.10. However, one difference between the Mississippi M3PI and RUG grouper methodology is that the special treatments and procedures groups are utilized only if provided after admission to the facility. Mississippi State Plan, at 89.

267.    Additionally, like the RUG III hierarchical model, the M3PI classification system is based on a descending hierarchical order ranging from most resource intense to the least resource intense. *Id.* "In a hierarchical classification system, assessments are sorted from those having the highest acuity/resource utilization to those with the least acuity/resource utilization." *Id.* at 94.

268.    Similar to RUG III's grouper,[2] Mississippi classifies residents into one of seven major categories: Impaired Cognition; Behavioral Problems; Reduced Physical Functioning,

---

[2] The RUG III classification system includes the following seven mutually exclusive major categories of resident types from which forty-four RUG III groups are classified:
(1) Extensive care, which includes three groups;
(2) Special rehabilitation, which includes five resident subtypes and fourteen groups;

Extensive Services; Rehabilitation; Special Care; and Clinically Complex. *Id.* at 92 -93. Once a resident has been placed into one of the seven major categories, the M3PI calculation program determines a resident's final classification based on two final considerations: 1) whether or not the resident meets the requirements for either "Depression" or "Nursing Rehabilitation" groups, and 2) residents needs based on the Activities of Daily Living assessment. *Id.* at 94.

269.　　To qualify for the "Depression Group," a resident must meet specific indicators of Depression as determined by MDS Assessment data. To qualify for the "Nursing Rehabilitation Group," a resident must receive two or more types of nursing rehabilitation for at least six (6) days a week, and fifteen (15) minutes a day, minimally. *Id.* at 93. According to MDOM, "some MDS 3.0 item sets do not contain all items necessary to calculate a RUGS III, 34 grouper payment classification." Code Miss. R. 23-207:2.9. Thus, default classification (BC1) would apply to such residents. *Id.*

**Nebraska**

270.　　To set Medicaid reimbursement rates for nursing facility residents, Nebraska classifies all nursing home residents using the 5.20 version of the Resource Utilization Groups-III (RUG-III), 34-grouper model using Index Maximization, as developed by the Centers for Medicare and Medicaid Services (CMS). Neb. Admin. R. & Regs. Tit. 471, Ch. 12-000, § 12-013 (West 2015). *See also* Nebraska Medicaid Provider Bulletin: Nebraska Medicaid Casemix MDS RUG-III Grouper Upgrade, http://dhhs.ne.gov/medicaid/Documents/pb1009.pdf.

**North Carolina**

---

(3) Special care, which includes three groups;
(4) Clinically complex, which includes six groups;
(5) Impaired cognition, which includes four groups;
(6) Behavior problems, which includes four groups; and
(7) Reduced physical functioning, which includes ten groups. Residents without any of the characteristics which result in assignment to the higher categories comprise the last resident type. Ohio Admin. Code 5160-3-43.2

271.    To calculate Medicaid reimbursement rates, North Carolina classifies all nursing home residents using the 5.12b version of the Resource Utilization Groups-III (RUG-III), 34-grouper model using Index Maximization, as developed by the Centers for Medicare and Medicaid Services (CMS). 10A N.C. Admin. Code 22G.0105

**Pennsylvania**

272.    To determine Medicaid reimbursement rates for nursing facility residents, Pennsylvania classifies all nursing facility residents using the Resource Utilization Groups System III (RUGS-III), 44 grouper model as developed by the Centers for Medicare and Medicaid Services (CMS). 55 Pa. Code § 1187.92 (West 2015).

**Texas**

273.    Texas Administrative Code, Chapter 355, governs the reimbursement methodology for nursing facilities. Texas uses Version 5.20 of the Resource Utilization Group (RUG-III) 34-group classification system and index maximizing, as developed by the state and the Centers for Medicare and Medicaid Services (CMS). 1 Tex. Admin. Code § 355.307(b)(2) (West 2015). Prior to transitioning to RUG in 2008, Texas classified their patients based on the Texas Index for Level of Effort (TILE) acuity-based classification system. *Id.* § 355.307(f).

**West Virginia**

274.    West Virginia's Medicaid agency, the Bureau of Medical Services (BMS) employs the Resource Utilization Groups-III (RUG-III), using a state-specific, 29-grouper model. Case-Mix Classification Workbook West Virginia Department of Health And Human Resources Bureau For Medical Services, at 1, Http://Www.Dhhr.Wv.Gov/Bms3/Documents/LTC/Case_Mixclassificationworkbook.Pdf.

275.     Utilizing the MDS assessments to determine the acuity level of each individual residing in the nursing facility, BMS first assesses each resident based upon the Activities of Daily Living (ADL). Id. Thereafter, each resident placed in one of nine RUG III Hierarchical Groups (High Intensity, Rehabilitation, Medium Intensity Rehabilitation, Low Intensity Rehabilitation, Extensive Care, Special Care, Clinically Complex, Impaired Cognition, Challenging Behavior, and Reduced Physical Functions). *Id.* Within each RUG Hierarchical Group, BMS then classifies a resident into one of West Virginia's case mix classes, ranging from 01 to 29. *Id.* at 14.

**Wisconsin**

276.     To determine Medicaid reimbursement rates for nursing facility residents, the State of Wisconsin employs version 5.20 of the Resource Utilization Groups-III (RUG-III), 34-grouper model using index maximization as developed by the Centers for Medicare and Medicaid Services (CMS). For higher-acuity patients, Wisconsin alternatively uses the "RUGs 48 grouper as pertinent with index maximization on the picture date for residents at the medical care levels." RUG 48 has additional groups to account for patients requiring more intense levels of care. Wisconsin Medicaid State Plan Amendment, Attachment 4.19 D, at 21, https://www.dhs.wisconsin.gov/mandatoryreports/mastateplan/4-19d.pdf.

### 3.  States Employing State-Specific Classifications

277.     Effective 2016, Tennessee has decided to employ a case-mix methodology using the Resource Utilization Groups IV (RUG IV), 48-grouper. Prior to the decision to transition to RUG, TennCare used an acuity-based system for the reimbursement methodology for skilled nursing facilities.

63

278.    To classify a nursing facility patient based on their acuity level, Tennessee used a numeric score derived from their Activities of Daily Living (ADLs). Tenn. Comp. R. & Regs. 1200-13-01-.10 (West 2015). The ADLs assessed the patient's mobility, in addition to their ability to eat, toilet, and transfer. *Id.* The maximum possible acuity score for Activities of Daily Living (ADL) is twenty-one (21). *Id.* In addition to the ADL score, the patient was assigned a score based on the level of skilled nursing and rehabilitation services needed. *Id.* The maximum possible acuity score for skilled and/or rehabilitative services was five (5). *Id.*

279.    Thereafter, the patient's total ADL score was added to the patient's skilled services acuity score in order to determine the resident's total acuity score. *Id.* The calculation resulted in an Individual Acuity Score using the TennCare NF Level of Care Acuity Scale. The maximum possible total NF LOC acuity score shall be twenty-six (26). *Id.*

### 4.  States Not Employing a Case-Mix Reimbursement System

#### Alabama

280.  Alabama uses a prospective, cost-based system to provide reimbursement to Medicaid providers of skill nursing homes. The providers' reported allowable costs are used as the basis for calculating the daily (per diem) rates. Ala. Admin. Code r. 560-X-22-.06 (West 2015). Alabama uses four components in calculating the rate: direct patient care costs, indirect patient care costs, operating costs, and property costs. *Id.* unlike case-mix states, Alabama does not adjust the direct-care cost component, or any of its other cost components for the resident's acuity. The sum of the four components results in the daily rate per patient for the cost report year. *Id.* Additionally, Alabama employs a ceiling for each component when calculating the allowable reported costs per patient. *Id.*

281. For Medicaid patients residing in the nursing facility for the full month, the monthly rate is computed by multiplying the per diem rate by 30.42 days. *Id.* However, for patients who located in the nursing facility for only part of the month, the per diem rate is multiplied times the number of days the patient was in the facility. *Id.* Thus, although Alabama does not use RUG, the differential rate calculations could provide an incentive to increase the number of patient days.

**California**

282. In California, the Department of Health Care Services (DHCS) administers California's Medicaid program, Medi-Cal. Each nursing home facility is categorized into a peer group based on geographic region and level of care associated with the facility. The level of care classifications for nursing facilities are: "level A; level B; subacute -- ventilator and non-ventilator d e p e n d e n t ; pediatric subacute -- ventilator and non-ventilator dependent; and transitional inpatient care -- rehabilitative and medical." California State Plan Amendment, Attachment 4.19-D, at 3, http://www.dhcs.ca.gov/formsandpubs/laws/Documents/Attachment_4.19-D.pdf.

283. Level A services are provided to residents requiring relatively low intensity services, while Level B, services are provided to residents requiring more intense, medically necessary services. *Id.* at 3-4. Thus, within the state's statutes and legislation, DHCS refers to skilled nursing facilities as "Nursing Facility Level B (NF-B)." Additionally, California recognizes that skilled nursing facilities can either be freestanding facilities, or distinct parts of hospitals. Thus, the reimbursement methodology for freestanding, nursing facility-B's, is separate from nursing facilities which are attached to hospitals. *See* Cal. Code Regs. Tit. 22, §51121 (West 2015).

65

284.    The Long-Term Care Reimbursement Act (AB 1629) establishes the Medi-Cal rates for both NF-B facilities and sub-acute care units of freestanding, NF-B facilities. http://www.dhcs.ca.gov/services/medi-cal/Pages/AB1629/LTCAB1629.aspx    Reimbursement rates for freestanding, NF-Bs will be based on a prospective, cost-based methodology to determine facility-specific per diem rates.    CA State Plan Amendment, Attachment 4.19-D, Supplement                       4,                       at                       6, http://www.dhcs.ca.gov/formsandpubs/laws/Documents/Supplement%204%20to%20Attachment%204.19-D.pdf. The per diem rate consists of labor costs, indirect care non-labor costs, administrative costs, professional liability insurance costs, capital costs and direct pass-through costs.

285.    Unlike a simplified "direct-care" component in most states, the direct-care component in California is classified under the "labor cost" category. The labor cost category is comprised of a direct resident care labor cost component, an indirect care labor cost component, and labor operating costs. *Id.* The direct-care component is not adjusted for the resident's acuity level as it is in case-mix states. However, the direct resident care labor costs are inflated and adjusted for retrospective audit findings. *Id.* at 7. Freestanding, NF-B's are reimbursed the lower of their actual cost per diem or the ceiling per diem amount. *Id.*

**Connecticut**

286.    Under the Connecticut Medicaid program, payment rates for nursing homes are set on a cost-based prospective basis. Connecticut uses a total of five cost groups: direct, indirect, administrative & general, property, and capital. The direct care component is not adjusted for the resident's acuity level. However, there are two peer groupings established by geographic location for each facility's level of care. Conn. Gen. Stat. Ann. § 17b-340 (West). One peer group is

66

comprised of all facilities located in Fairfield County, while the other peer group is comprised of facilities located in all other counties. *Id.* Each facility's allowable costs are limited by statutory ceiling based on geographic location. *Id.*

287.     Although Section 17-311-52 of the Regulations of Connecticut State Agencies provides that "[p]er diem reimbursement rates shall be calculated for each level of care, e.g., chronic and convalescent hospital, rest home with nursing supervision and home for the aged," this reference is not indicative of an applicable case-mix. Conn. Agencies Regs § 17-311-52 (West 2015).   On June 8, 2015, I spoke with Betsy Bujwid, the Principal Cost Analyst at Connecticut's Department of Social Services. She confirmed that Connecticut Medicaid does not use case mix for nursing facility reimbursement. (interview citation).

**Michigan**

288.     The Michigan Medicaid Program utilizes a prospective, cost-based system to establish the reimbursement rates paid to long term care facilities. Michigan Medicaid Provider Manual, Nursing Facility Cost Reporting & Reimbursement Appendix, at a1, http://www.mdch.state.mi.us/dch-medicaid/manuals/medicaidprovidermanual.pdf.           While Michigan does not presently use a case-mix, Michigan does place a patient into a nursing facility based on the level of care and resources needed.   In Michigan, there are seven classes of long-term care facilities, including one special class. *Id.* at a87.   There is a separate reimbursement method for each class. *Id.*

289.     To determine the patient's level of care, Michigan Department of Community Health uses the Michigan Medicaid Nursing Facility LOC Determination's medical/functional criteria.   Michigan Medicaid Provider Manual, Nursing Facility Coverages, at 9,

http://www.mdch.state.mi.us/dch-medicaid/manuals/medicaidprovidermanual.pdf. The LOCD criterion considers a total of seven factors[3], one of which is Activities of Daily Living.

290.    Nursing facility billing is only allowed for services provided for in a valid LOCD. *Id.* The Michigan Medicaid Nursing Facility LOC Determination must be completed by a health Professional; however, non-clinical staff may perform the evaluation with clinical oversight by a licensed professional. *Id.* at 10.

291.    For this present case, skilled nursing facilities fall within Class I and III facilities. The per diem reimbursement rate for Class I and Class III nursing facilities are made up of three components: a plant cost component, a variable cost component, and add-ons. *Id.* at a87. Variable costs consist of the total allowable base and support costs in a facility's routine nursing service units. *Id.* at a59. Variable costs are allocated depending on the activity for which the cost was incurred. *Id.* Plant costs include depreciation, interest expense, and real estate and personal property taxes. *Id.* at a60. Add-ons are items that provide reimbursement to a provider for costs that are not previously included in the provider's variable cost component *Id.* at a105. Neither of Michigan cost center calculations includes an adjustment for the patient's acuity level.

**South Carolina**

292.    South Carolina employs a complex, cost-based reimbursement methodology, which is subject to ceilings and floors. A prospective rate is determined separately for nursing facility based on two criteria: the facility's standard costs, and the facility's cost report. South Carolina State Plan Amendment, Attachment 4.19-D, at 13, https://www.scdhhs.gov/sites/default/files/SC%2012-013%204.19D%20pages%20final%20CMS%20approved%20pages%20%28all%20pages%20incorp orated%29_0.pdf.

---

[3]  The seven factors include: Cognitive Performance, Physician Involvement, Treatments and Conditions, Skilled Rehabilitation Therapies, Behavior, Service Dependency, and Activities of Daily Living

Case 3:15-cv-01102   Document 40-1   Filed 07/30/15   Page 33 of 40 PageID #: 453

293.    The "standard costs," are a major component of South Carolina's reimbursement rate. *Id.* at 15. The "General Services Standard" is most closely related to what is referred to as the "Direct Care Component" in other states. The General Service component consists of nursing and restorative services. *Id.*

294.    To calculate the General Service Standard, first, determine "all allowable cost for the General Services cost center…for all facilities in each bed size[4]." *Id.* Second, "determine total patient days by multiplying total beds for all facilities in each group by (365 x 92%)." *Id.* Third, "calculate the mean cost per patient day by dividing total cost in (a) by total patient days in (b)." *Id.* Finally, "calculate the standard by multiplying the mean by 105%." *Id.* The sum should result in a base rate for the general services standard for the facility, and is directly related to the number of Medicaid A patients in the facility. *Id.* "The establishment of the General Services standard for all nursing facilities (excluding state owned facilities) will be based on the average of the percentage of Medicaid Level A patients/total Medicaid residents served…The base standard is decreased as the percent of Level A Medicaid patients is decreased and increased as the percent of Level A Medicaid patients is increased." *Id.*

295.    The initial step used to determine the reimbursement rate for each facility is to calculate the allowable costs for two categories of services: 1) Costs Subject to Standards and 2) Costs Not Subject to Standards.

296.    The costs components that are subject to standard are: 1) General Services; 2) Dietary; 3) Laundry, Maintenance and Housekeeping; and 4) Administration and Medical Records & Services.

297.    The costs that are not subject to standards are: Utilities; Special Services; Medical Supplies; Property Taxes and Insurance Coverage - Building and Equipment; and Legal Fees. To

---

[4] South Carolina categorizes their facilities into peer groups based on the 3 levels of bed sizes: 0-60 beds, 61-99 beds, and 100+ beds.

Case 3:15-cv-01102   Document 40-1   Filed 07/30/15   Page 34 of 40 PageID #: 454

calculate these cost components, a standard is not used. Instead, calculate the actual allowable cost per day based on the cost reports for each category. To do this, divide the allowable cost by the actual number of days the resident was located in the facility. If the facility has less than 92% occupancy, the actual days will be adjusted to reflect 92% occupancy. South Carolina's cost components are not adjusted based on the resident's acuity level.

### Wyoming

298.    The Wyoming Medicaid program calculates a minimum and maximum per diem rate for each nursing facility according to a prospect, cost-based methodology. The per diem rate consists of the following the following cost components: health care costs; capital costs; and operating costs. Wyo. Admin. Code § HLTH MDCD Ch. 7 s 9. The Health care cost component refers to costs of the medically necessary services actually provided to the patient while the patient was located within the nursing facility. Because Wyoming is not a case-mix state, this cost-component is not adjusted for the patient's acuity level.

299.    To determine the minimum per diem rate, calculate "the nursing facility's base rate, minus the capital component of that rate, plus the capital component of the nursing facility's calculated rate. The minimum rate shall be the rate paid if it is greater than the calculated rate." Wyo. Admin. Code § HLTH MDCD Ch. 7 s 17.

300.    To determine the maximum per diem rate for each nursing facility, calculate "[t]he base rate, minus the capital component of that rate, multiplied by one hundred ten percent (110%) of the inflation factor…" *Id.*

## V.    RELATOR'S DISCOVERY OF DEFENDANTS' FRAUD

### A.    Relator's Discovery of Defendants' Fraudulent Actions

301.    Based on Relator's direct and independent knowledge, Defendants have

defrauded the United States by knowingly causing the Medicare, Medicaid, CHAMPUS/CHAMPVA programs to pay false and fraudulent claims for services provided by Sava, Woodwind Lakes and the Associated Facilities since at least 2005, as described in detail below:

1. **Fraudulent Retention of Medicare Residents Who Have No Need for Further Skilled Nursing Care Services**

302. At Woodwind Lakes, similar to all Affiliated Facilities, patients are admitted for skilled nursing care services that are covered under Medicare Part A, including rehabilitative therapies such as speech and physical therapy. Once the patient has finished his or her course of therapy or has reached a point at which it is determined by medical personnel that the patient will no longer improve, the Rehabilitation Department's staff will record in the patient's chart that the patient no longer needs rehabilitative services.

303. On the very first day of her employment with Sava, Relator Kukoyi's direct supervisor, Angela McArthur, the facility's Administrator, made clear that her mission was to maximize the number of Medicare patients in Woodwind Lakes by retaining every Medicare patient for the full 100 days of Medicare benefits, regardless of the Rehabilitation Department staff's recommendations. On that day, McArthur approached Kukoyi and told her simply that, as the facility's sole licensed social worker, Kukoyi was to add notes to patients' charts falsely describing patients' supposedly problematic behavioral issues and condition, such that the chart would support a determination that the patients remained qualified for skilled nursing care under Medicare Part A. As this was her first day on the job, Kukoyi followed McArthur's directions.

304. Kukoyi learned that McArthur did not care that the medical personnel in Woodwind Lakes' Rehabilitation Department had previously documented in the medical records that the patient no longer needed such care, so long as supplemental notes created a ruse for

71

continuing to bill Medicare Part A until the exhaustion of the patient's coverage.

305. On Kukoyi's review of the patient charts that she was ordered to alter, she found that Woodwind Lakes' medical personnel who provided the patient's rehabilitative services had frequently noted that the patient had "significantly improved" under rehabilitation criteria. The medical personnel had then made the resultant determination that the patient no longer needed skilled nursing services and was ready for discharge, as noted in the patient's medical chart. Had McArthur heeded the recommendation, the patient would have been discharged either to another wing in the facility that provided custodial care, or to wherever the patient had living arrangements ready.

306. But instead of following the Rehabilitation Department's medical recommendations and discharging the patient or transferring the patient into another wing of the facility for continued custodial care covered by Medicaid, Administrator McArthur would instruct her staff to supplement the charts to add fictitious behavioral conditions that McArthur believed would warrant retaining the patient under the skilled nursing care umbrella. On occasion she would add such notes herself. Exhibit 3, as discussed below, comprises such an example. The notes were filed in the patient's chart and related false claims for reimbursement were submitted to Medicare Part A.

307. Over the next three months, Kukoyi learned that McArthur's demands to alter patient charts to justify patients' continued stay were the normal practice at Woodwind Lakes, and were condoned and, indeed, encouraged, by Sava. Retaining the patient under skilled nursing care would allow the facility to continue billing Medicare Part A for the services provided. This was important to the facility's bottom line because, as Sava and McArthur are well-aware, Medicare Part A reimburses for skilled nursing care at a higher rate than Medicaid

reimburses for custodial long term care.

308.    Kukoyi also learned from McArthur that McArthur and Director of Nursing Josephine Girandi each earned quarterly bonuses from Sava based on the dollar amount billed to Medicare Part A and the Medicare "census," which is the number of patients in the home each day. McArthur told Kukoyi that Sava paid her up to $20,000 a quarter based on the Medicare reimbursement and census numbers, providing abundant incentive to its administrators to manipulate medical charts in order to retain Medicare patients.

309.    McArthur even included the bonus based on the census as a topic to discuss with Kukoyi in one of their first meetings together. Exhibit 5 is a copy of the agenda for a meeting between Kukoyi and McArthur on February 8, 2011. On this agenda, McArthur included under "Topic 1 – Admission" an item titled "Bonus for Census." The notation clearly indicates if the facility does not maintain a good census, there is no bonus.[5] Moreover, on this agenda it is clearly noted, twice, that Kukoyi's responsibilities including "selling" the facility and "EXTEND[ING]" residents' stays "as needed."

310.    The supplemental notes that McArthur demanded were false and/or misleading, and as a certified social worker, Kukoyi was not and is not qualified to make the kinds of medical assessments they entailed. Neither is Angela McArthur. McArthur, a ten-year employee for Sava, does not have a medical degree. She is a licensed Nursing Facility Administrator whose responsibilities include directing and planning the operations of the facility as well as providing supervision for the staff. Her position does not require any medical education or background. Nonetheless, McArthur routinely adds documentation to patients' records in order to justify the continued billing to Medicare for unnecessary skilled nursing care services. An example of her documentation is found in Exhibit 3. This exhibit contains an

---

[55] The handwritten notes were added by Relator.

excerpt of a patient's chart in which McArthur added notes of her own, assessing the patient's condition as exhibiting aggressive behavior towards other patients, such a yelling in the hallway and not turning down the television when requested by her roommate. McArthur used this behavior to justify continued skilled nursing care services and billing of Medicare Part A.

311.    In fact, however, this behavior does not fall within skilled nursing services and thus, any services provided under Medicare Part A were medically unnecessary. As discussed in detail above, in order for skilled nursing care services to be covered by Medicare Part A, the condition that is being treated must relate back to the *qualifying* hospital stay for which the patient was admitted to the SNF. McArthur does not mention in the notes submitted under Exhibit 3 how this "aggressive" behavior stems from the patient's *qualifying* hospital stay. Nor does she indicate the appropriate type of care or therapy needed to rehabilitate this particular unnamed condition or the estimated length of time such care will take. Moreover, it is difficult to accept that yelling in the hallway equates to the need for the daily specialized care covered under Medicare Part A. Most of the notes that McArthur demanded similar failed to actually support a medical necessity determination to justify continuing skilled nursing care.

312.    In supplementing patients' charts with fraudulent notes, McArthur did not disturb the notes recorded by the Rehabilitation Department. Thus, a review of the medical records of wrongfully retained patients' charts would reveal both the rehabilitation department's accurate documentation and McArthur-directed fraudulent records meant to justify continued skilled nursing care. It would further reveal records documenting exactly what rehabilitative care was provided on what dates.

313.    On the 100th day of a dually-eligible patient's stay, McArthur was as eager to discharge the patient as she had been to retain the patient earlier in his or her stay. Exhibit 6 is

74

an example of Woodwind Lakes' census data and the tracking of Medicare days. The numbers in descending order represent patient's remaining Medicare Part A beneficiary days. As discharging a patient falls with the purview of the licensed social worker's responsibility, McArthur would instruct Kukoyi "to do something" with that patient -- "just discharge" the patient immediately. Kukoyi would then arrange for the patient to either transfer to a Medicaid certified bed in the facility or for other living arrangements outside of the facility. Discharge data from Woodwind Lakes, if queried, would therefore reflect that a disproportionate number of Medicare enrollees would remain in the Medicare certified beds until the exhaustion of their benefits.

314. Thus, Sava retained patients in Affiliated Facilities' skilled nursing facilities beds rather than discharging them out of the facility or to custodial care beds so that it could continue to charge under Medicare Part A for that more lucrative stay and under Medicare Part B for rehabilitation services, some of which would be provided, and some of which would not.

## 2. Fraudulently Creating Minimum Data Sets Resulting in Higher Reimbursement Rates.

315. Upon a patient's admission to a long-term care facility, including skilled nursing facilities, CMS requires that the facility complete a Minimum Data Set assessment, which is a standardized uniform comprehensive assessment of a patient that identifies that patient's health conditions and functional capabilities. The data from this assessment is transmitted electronically and submitted to state surveyors, then forwarded on to CMS, where it is maintained within that agency's Minimum Data Set Repository, which is a component of CMS's Online Survey, Certification, and, and Reporting Database. While the Minimum Data Set (MDS) is part of the U.S. federally mandated process for clinical assessment of all residents in Medicare or Medicaid-certified nursing homes, nursing homes perform the assessment on all