patients. This process provides a comprehensive assessment of each resident's functional capabilities and helps nursing home staff identify health problems. Under 42 C.F.R. §413.343(b), a facility is required to conduct further assessments again on the fifth, fourteenth, thirtieth, sixtieth, and ninetieth day of the Medicare Part A stay, to ensure that the skilled nursing care remains medically necessary.

316.    In most cases, participants in the assessment process are licensed health care professionals, usually registered nurses employed by the nursing home. Categories of MDS include cognitive patterns, communication and hearing patterns, vision patterns, physical functioning and structural problems, continence, psychosocial well-being, mood and behavior patterns, activity pursuit patterns, disease diagnosis, other health conditions, oral/nutritional status, oral/dental status, skin condition, medication use, and treatments and procedures.

317.    Additionally, data collected during the assessment are used for Medicare Part A reimbursement. The Medicare reimbursement is calculated based on the Resource Utilization Groups ("RUG") score assigned to each patient. The RUG score reflects the acuity level of the patient's care: a low RUG score indicates a patient functioning at a higher level and requiring less expensive/time-intensive intervention and care, while a patient with a high RUG score requires a high amount of care and is reimbursed accordingly. The RUG score should correlate with the assessment in the patient's corresponding Minimum Data Set.

318.    As part of Kukoyi's licensed social worker's responsibilities, she was required to fill out certain portions of the Minimum Data Set. It was during her review of the Minimum Data Sets for patients whom she had personally observed that Kukoyi realized that Sava was fraudulently completing the documents in order to justify the highest Medicare reimbursement rates for patient care. Specifically, the Minimum Data Set often did not reflect either the

patient's actual condition upon admission or the particular treatment needed. Indeed, because, as Kukoyi witnessed, McArthur herself directed the completion of such documents on a patient-by-patient basis, the assessment often did not reflect the pertinent professional's actual observation. At an internal meeting on the subject that Kukoyi attended, McArthur told the staff responsible for completing the Minimum Data Sets to make a practice of filling out the documents in such a way that higher reimbursement rates would be assigned by Medicare, as "we need that higher rate," regardless of patients' actual condition. Indeed, Relator Kukoyi noted that the highest RUG rate for skilled nursing care – "RUX" – was routinely used in assessments, even those following the Rehabilitation Department's recommendation that the patient be discharged from receiving skilled nursing care due to significant improvement.

319.     As noted on Exhibit 4, which is the federally approved Medicare Part A list of RUG categories and corresponding rates, the highest reimbursement rate covered by Medicare Part A is the RUG rate "RUX." RUX indicates that the level of therapy needed is "ultra-high" with "extensive services" required as well as 720 minutes of therapy a week. As illustrated on Exhibit 4, a RUX rate is reimbursed at a daily rate of $1,958.09.

320.     Staff at Woodwind Lakes routinely use the RUX rate for patients who no longer qualify for skilled nursing care. Thus, not only is Woodwind Lakes regularly billing Medicare for patients who no longer need skilled nursing care, but it is doing so at grossly inflated RUG rates.

321.     Woodwind Lakes has 180 patient beds in its facility. As demonstrated in Exhibit 8, which is a daily census reporting tool used by the facility staff, Sava calculated its operating budget based on having 158 of the 180 beds occupied. Sava's budget required that eighteen of the 158 beds be filled with Medicare Part A patients. Any occupancy rate above eighteen beds

represents pure additional profit to Sava.  On March 30, 2011, the date of the daily census submitted as Exhibit 8, Woodwind Lakes had twenty-one Medicare Part A patients.  The January 2011 monthly census, submitted as Exhibit 6, shows that the facility had 28 Medicare Part A patients throughout that month.  Assuming that Woodwind Lakes maintains an average of twenty-five Medicare Part A patients in a typical month and bills at the highest RUG rate for every one of those patients, Medicare Part A revenue constitutes over $1,000,000.00 a month for this single facility.  Indeed, even if Woodwind Lakes bills for only half of such patients at the highest RUG rate, its monthly Medicare revenue is $720,000.00 a month.  Given Sava's bonus structure, Sava's other 190 facilities are achieving similar monthly Medicare revenue.

322.    During Relator's employment with Woodwind Lakes she observed that patients received actual rehabilitative services for an average time of two weeks to twenty days.  Given, Woodwind Lakes' practice of retaining the Medicare Part A patients for the full one hundred day beneficiary period, the resulting fraudulent claims would account for an estimated three-quarters of the claims submitted for Medicare Part A patients, or $750,000.00 a month if routinely billed at the highest RUG rate.

323.    Sava's central management directs these fraudulent coding practices in its Affiliated Facilities.  Alice Hope, a certified medical coder and former co-worker of Relator Kukoyi, left Sava in early 2010 because of the fraudulent coding practices that Sava instructed her to perform.  She told Kukoyi that at a national training of Sava coders, the coders received instruction to code all services at the highest rate, regardless of the patient's condition.  Sava trainers added the warning to "make sure the documentation is in the records."

324.    Following Alice Hope's departure, Sava had Elaine Gross, an LVN, perform the coding work.  Under Texas State regulations, an LVN without further training is not qualified to

perform coding. During the Texas DADs survey in April 2011, Sava received a demarcation on its survey for not having the properly qualified staff performing the coding.

### 3. Fraudulent Billing for Skilled Nursing Care Services Not Provided

325. With regard to the Medicare enrollees whose stay was extended, and whose RUG scores were inflated and underlying Minimum Data Sets were falsified to maximize Sava's profits, some of these enrollees no longer received the rehabilitative services for which Sava continued to bill Medicare. Once the Rehabilitation Department discharged the patient from receiving such services, it no longer provided such services, regardless of how the facility billed Medicare for the patient's care. For example, Kukoyi knows of two elderly male patients who were continually billed under Medicare Part A but did not receive the services for which Medicare was billed. Kukoyi knows that these patients did not receive the services, because they were unable to get out of their beds to receive such services. Kukoyi can supply the names of these two patients.

## VI. DEFENDANTS' FRAUDULENT BILLING SCHEMES, PAYMENT OF KICKBACKS, AND CONSPIRACY TO DEFRAUD THE GOVERNMENT

### A. Sava's Fraudulent Bills to Medicare Part A, Medicaid and CHAMPUS/CHAMPVA

#### 1. Fraudulently Reporting That Patients are Eligible for Skilled Nursing Care Services

326. As discussed above, on her first day at Sava, Relator was asked by Administrator Angela McArthur to falsify patients' records in order to continue Medicare Part A for skilled nursing services. In the three months during which she was employed at the facility, Relator Kukoyi was frequently instructed by McArthur not to release a patient until the facility had billed for the full length of the patient's Medicare Part A benefits period, up to 100 days of care. Once the patient reached the end of his or her Medicare Part A benefits period, in contrast, McArthur

Case 3:15-cv-01102  Document 40-2  Filed 07/30/15  Page 4 of 40 PageID #: 464

instructed the staff to discharge the patient immediately.

327.    As a social worker in the facility, Relator Kukoyi had access to all the patients' medical records. She frequently reviewed the records in her course of social work duties, which included arranging for patients' discharge. She noted that the records maintained by the Rehabilitation Department in patient charts were accurate and correctly represented the care provided. She also noted that the billing submitted by the Rehabilitation department to Medicare Part A was also accurate and represented the care provided. It was not until after the Rehabilitation department properly discharged the patients from skilled nursing care, Kukoyi noticed, that the fraudulent entries appeared, accompanying fraudulent billing submitted to Medicare Part A, Medicaid and CHAMPUS/CHAMPVA for skilled nursing care that was not unnecessary and/or not provided.

328.    Sava knew of the practices of billing Medicare Part A for skilled nursing services that were medically unnecessary and not actually provided. Kukoyi informed them of these practices in her e-mail dated April 5, 2011, wherein she specifically asserted that Administrator McArthur was instructing her and staff to "fix" notes in patients' records so that the facility could continue to bill Medicare. See Exhibit 2. On April 10, 2011, Al Reisner from Sava's Human Resources Department came to Woodwind Lakes to discuss the concerns Kukoyi raised, including fraudulently billing Medicare, in her April 5, 2011 e-mail. During the meeting, rather than assuring Relator that her concerns would be addressed and any corrective actions taken, Mr. Reisner informed Relator that "we [Sava] are in the business of making money." Sava did not further investigate Kukoyi's concerns while she was still employed. Kukoyi did not receive any further communication from Sava regarding the issues she raised nor was she aware of any proposed changes to procedure or policy. Relator Kukoyi maintains contact with the present

80

Woodwind Lakes social worker, who informs her that the facility continues this course of operation today.

329.    Sava thus knowingly caused and causes Woodwind Lakes and the Affiliated Facilities to certify falsely that the services would/will be "provided economically and only when and to the extent, medically necessary." 42 U.S.C. § 1320c-5. Sava is responsible for the full costs of patients' care after such services were no longer necessary.

330.    Additionally, Sava's practice of fraudulently creating records in order to continue to bill Medicare Part A for skilled nursing care that was medically unnecessary or not provided resulted in fraudulent billing not only to Medicare Part A, but also to Medicaid and CHAMPUS/CHAMPVA. As explained above, after the twentieth benefit day for patients receiving skilled nursing care, Medicare Part A only covers eighty percent the claim. Medicaid or CHAMPUS/CHAMPVA, if the patient is eligible, will then pay the remaining twenty percent. Due to Sava's practice of utilizing patients' entire Medicare Part A benefits for skilled nursing care, after the twentieth benefit day, Sava would also submit fraudulent bills to not only Medicare for eighty percent of the coverage, but also Medicaid or CHAMPUS/CHAMPVA on behalf of eligible beneficiaries for payment of the remaining twenty percent. Because the underlying claim to Medicare was based on medically unnecessary services or services that were not provided, Sava's submission of claims to Medicaid or CHAMPUS/CHAMPVA were also fraudulent claims. Many of these patients, had Sava accepted the recommendation of the Rehabilitation Department in the first place, would have been discharged to their homes, where they would have no longer received any nursing care reimbursed by government programs.

**2.    Fraudulently Billing for Skilled Nursing Care Services Not Provided**

331.    As noted above, Relator knows that Woodwind Lakes routinely billed Medicare Part A for skilled nursing care services without actually providing the services to patients. As stated previously, Medicare will only cover services that are reasonable and necessary.

332.    Also as discussed above, Kukoyi observed that while the patients were under the direct care of the Rehabilitation department, the record of care and services provided were properly created. Once the Rehabilitation department discharged the patients from their service, and Angela McArthur and staff would begin fraudulently creating records in order to justify the continued billing to Medicare Part A, Medicaid and CHAMPUS/CHAMPVA, the records no longer contained proper or true documentation for the medical need for the skilled nursing care services. Furthermore, Relator Kukoyi noted that the patients' records were devoid of any documentation that rehabilitation services were actually provided following discharge by that department. The simple reason was that those services were not provided.

333.    As stated above, in order to receive Medicare Part A reimbursement, a facility must assure that the services "will be provided economically and only when and to the extent, medically necessary. 42 U.S.C. § 1320c-5. Under CMS's Skilled Nursing Facility Manual, if the patients' medical records show that the patient no longer needed the services or the level of care provided, the SNF is financially liable for the cost of services provided after the date of the notation that such services were no longer necessary. Centers for Medicare and Medicaid Services Skilled Nursing Facility Manual, Chapter 2 – Coverage of Services §356(E).

334.    Because Woodwind Lakes knowingly submitted false and or fraudulent claims for services that were not provided, Medicare Part A unnecessarily reimbursed the facility for these fraudulent claims. Additionally, fraudulent claims were also submitted to Medicaid or CHAMPUS/CHAMPVA on behalf of dual eligible beneficiaries for payment of the remaining

twenty percent of the costs following the eightieth day of care. Because the underlying claim to Medicare was based on services that were not provided, the submission of claims to Medicaid or CHAMPUS/CHAMPVA was also fraudulent.

### 3. Fraudulently Creating Minimum Data Sets Resulting in Higher Reimbursement Rates

335. During Relator's three months of employment with Sava, she observed that Sava nurses were filling out the Minimum Data Set in such a way as to exaggerate the severity of the patients' health condition upon admission, which resulted in inflated RUG rates. These inflated RUG rates in turn resulted in higher Medicare reimbursements. Under 42 C.F.R. §413.343(b), a facility is required to conduct an assessment upon admission and again on the fifth , fourteenth, thirtieth, sixtieth and ninetieth day of the Medicare Part A stay, to ensure that care remains medically necessary. Furthermore, these assessments or certifications and recertification of services are necessary in order to receive payment from Medicare Part A for skilled nursing care provided by a SNF. See, 42 C.F.R. 424.20. Woodwind Lakes continually violated these conditions for Medicare payment through its fraudulent completion of the Minimum Data Sets. Woodwind Lakes fraudulently certified through the use of these Minimum Data Sets that the skilled nursing care was needed to treat a condition for which the patient received treatment in a hospital. Subsequently, based on these fraudulent Minimum Data sets, fraudulent claims for service were submitted to Medicare, Medicaid and TRICARE/CHAMPUS/CHAMPVA.

336. Sava knew and condoned the fraudulent completion of the Minimum Data Sets. These documents were fraudulently filled out based on Administrator McArthur's patient-by-patient instructions, as noted earlier. That higher rate resulted in higher reimbursement from Medicare Part A. Moreover, as discussed below, Sava incentivized its employees, through the use of quarterly bonuses to submit claims that resulted in higher reimbursement.

83

### 4.   Fraudulent use of "RUX" RUG Rate and Other Inflated Rates

337.   In conjunction with fraudulently filling out the Minimum Data Sets, Woodwind Lakes routinely used the RUX rate, the highest reimbursement RUG score covered by Medicare Part A for patients who no longer qualified for skilled nursing care.   Additionally, these extensive services were not provided once the Rehabilitation Department discharged the patient from receiving such services.   Moreover, the documentation in the patients' medical records does not support the medical necessity of the acute services or RUX rate.

338.   Sava knew of and condoned this fraudulent coding practice in its Affiliated Facilities.   As noted above, Alice Hope, a Sava medical coder and co-worker of Relator Kukoyi, confirmed that she and others received instruction at a national training to code all services at the highest rate.   Sava added the warning to "make sure the documentation is in the records."

339.   Again, Sava's practices are not in compliance with Medicare Part A laws, rules and regulations.   Medicare will not pay for services that are "not reasonable and necessary."   42 U.S.C. § 1395(y); see also, Centers for Medicare and Medicaid Services Skilled Nursing Facility Manual, Chapter 2 – Coverage of Services §280.1.   Artificially inflating the RUG score for patients whose actual health conditions do not warrant such intense level of care or services is neither reasonable nor necessary.   As such, due to Sava practices throughout its Affiliated Facilities of falsifying the RUG rates for its patients, Sava has fraudulently submitted claims to Medicare Part A for reimbursement.   Based on the manner in which governmental agencies provide coverage for skilled nursing care, Sava has also caused fraudulent claims to be submitted to Medicaid and CHAMPUS/CHAMPVA.

### 5.   Fraudulently Retaining Patients in Violation of Patients' Rights

340.   Woodwind Lakes' practice of keeping patients in the facility until their Medicare

Part A benefits were exhausted also violated the patients' rights guaranteed under 42 C.F.R. Part 483 Subpart B. As noted above, compliance with 42 C.F.R. Part 483, Subpart B is a condition of payment under the Medicare and Medicaid programs. Subpart B contains the requirements for states and long term care facilities that must be met when providing care to patients.

341. Specifically, under 42 C.F.R. § 483.10(2), patients have the right to be free from interference, coercion, discrimination, and reprisal from the facility in exercising their rights, including self-determination. Self-determination incorporates a patient's right to decide when to leave a facility. Moreover, patients under 43 C.F.R. § 483.10(d) have the free choice to participate in planning the care and treatment they receive or to make changes to such care and treatment. Woodwind Lake s did not allow the Medicare Part A patients to have a choice in their care or treatment once they were discharged from the care of the Rehabilitation department. Administrator McArthur made those decisions for the patients until their Medicare Part A benefits were exhausted.

342. Sava directs all of its facilities to elevate profits over patient rights in the same way, thus violating the condition of Medicare and Medicaid payment under 43 C.F.R. Part 483 Subpart B. Kukoyi informed them of these practices in her e-mail dated April 5, 2011, wherein she specifically asserted that Administrator McArthur was restricting the residents' right to leave the facility in order to continue to bill Medicare and exhaust the patients "Medicare days." See Exhibit 2. But when Al Reisner from Sava's Human Resources Department came to Woodwind Lakes on April 10, 2011 to discuss the concerns Kukoyi had raised in that email, including fraudulently billing Medicare, Mr. Reisner merely informed Relator that "we [Sava] are in the business of making money."

**B.** **Provisions of Kickbacks in the Form of Employee Bonuses for Maintaining the Census and Billing Medicare Part A**

343.    Kukoyi was frequently reminded by Administrator McArthur that McArthur and the Director of Nursing Josephine Girandi's bonuses depended directly upon the amount of money for which Woodwind Lakes' facility billed Medicare.  McArthur informed Kukoyi that McArthur could earn up to a $20,000 quarterly bonus if the facility maintained high Medicare billings.

344.    In violation of the Anti-Kickback Statute, Sava incentivized its employees to retain patients who no longer qualified for skilled nursing care, to fraudulently bill for services that were not provided, and to submit billing to Medicare Part A based on the fraudulent use of the inflated RUG rates by offering a quarterly bonus based on the amount of money billed to Medicare and maintain the facility census.

345.

## C.    Conspiracy to Defraud the Government

### 1.    Sava Is Conspiring with its Employees to Defraud the Government

346.    By means of the kickbacks offered by Sava, Sava employees are incentivized to create fraudulent medical records indicating the patients' required continued skilled nursing care, even when that care is not medically necessary, the patients no longer require such care and/or the patients never receive the care for which Sava billed Medicare Part A.  These kickbacks, which were offered in the form of quarterly bonuses based on maintain the Medicare census in the facility and continued bill of Medicare Part A, allowed Sava to guarantee higher Medicare Part A reimbursement rates for its Affiliated Facilities.

## VII.    SAVA AND WOODWIND LAKES' RETALIATION AGAINST KUKOYI

347.    For three months, Relator Kukoyi observed and was asked to participate in activity that she did not think was medically ethical or morally right.  Within this short span of

time she was asked repeatedly to falsify documentation in patient's medical records. She witnessed two patients' deaths that she considered preventable if the correct medical care had been provided. Woodwind Lakes chose not to provide such care, however, because of its negative effect to the facility's profit margin. Following the second patient's death on April 4, 2011 - the patient had been accidentally dropped on her head, thus killing her - Kukoyi was compelled to take action. First, she filed an anonymous report to DADs stating that the death was suspicious and should be investigated.

348.    Second, on April 5, 2011, she sent an e-mail to Peter Lougee, then President for the West Division of SavaSeniorCare Consulting, L.L.C., informing Management of the numerous infractions taking place at Woodwind Lakes. She outlined her "serious concerns about the administrator which could cost the company millions." Peter Lougee regularly communicated with the staff of various Affiliated Facilities with the stated purpose to improve the facilities' performance in order to provide excellent care and improve the quality of life for the patients. Exhibit 7 is a good example of his personal involvement with the Affiliated Facilities West Division's staff on reaching those goals. In this February 16, 2011 e-mail, he addresses "Team West Division" on the close of the 2010 Trimester Review. Staff from the various regions: Central, Gulf Coast Texas, Mountain North, Mountain South, North and South Texas, participated in an "Improve Environmental Excellence and Use Resources More Effectively" contest. Mr. Lougee espoused a desire to encourage his employees to continue proposing new ideas after the contest concluded, as it ultimately impacted the patients, who would benefit from "an environment of exceptional care and quality of life." Kukoyi assumed that Mr. Lougee would be interested to know how far Woodwind Lakes had veered from offering exceptional care or a good quality of life to its residents. She assumed incorrectly.

349. In her e-mail, Kukoyi specifically noted that "your administrator" restricts the residents' "right to discharge home in order to bill Medicare and exhaust there (sic) Medicare days. She continues to inform Mr. Lougee of Administrator McArthur's "unethical behavior" through a listing of incidents of inappropriate behavior and corresponding dates.

350. Kukoyi described, as an example, an incident occurring on February 8, 2011, wherein McArthur wanted a Minimum Data Set completed on a particular patient in order to complete the required certification of medical necessity. When the clinical staff during a meeting informed McArthur that the particular patient at issue already had been discharged, McArthur replied, "Medicare can take back all of our money because we have no certs." This required documentation demonstrates the ongoing medical necessity assessments required by Medicare. In addition, it reflects that McArthur was more concerned about retaining the Medicaid reimbursement than she was about patient care, and that the facility was not in compliance with the Medicare regulations for condition of payment under 42 C.FR. 424.20.

351. Another incident Kukoyi noted in her e-mail occurred on March 31, 2011, during the facility's morning meeting. Catherine, a staff member with the Rehabilitation Department, told McArthur that her behavior pertaining to a particular patient was "Medicare fraud," and McArthur reply was simply "It wasn't me." McArthur's response demonstrates that she is more concerned with avoiding personal blame for fraud then she is interested in establishing and maintaining an environment in which fraud does not occur. Of course, as Nursing Home Administrator, McArthur actually is responsible for what occurs in the facility.

352. Kukoyi also informed Mr. Lougee that on March 24, 2011 at 9:30 a.m., Administrator McArthur wanted Kukoyi and a PPS nurse to fix a note showing that the resident had "behaviors." McArthur instructed them to make this "fix" so the facility "could continue to

bill Medicare." Kukoyi "informed her that I had not witnessed any behavior." Kukoyi did not want to make the requested changes. McArthur's response was that Kukoyi and the PPS nurse were arguing with her.

353.    Kukoyi stated in this e-mail to Mr. Lougee that she was "coming forward to whistle blow about her [administrator] unethical conduct and I know I will be fired for this." See Exhibit 2 which is a copy of this e-mail, which specifically discusses "Medicare fraud." Expressing her concerns regarding the operations at Woodwind Lakes ultimately caused Kukoyi's termination, as described below.

354.    Relator Kukoyi did not hear from Sava until five days later, when, on April 10, 2011, Al Reisner from Sava's Human Resources Department met with her at Woodwind Lakes to discuss her April 5, 2010, e-mail to Mr. Lougee. As noted above, after Relator expressed her concerns, including that she thought the facility was engaging in Medicare fraud Mr. Reinser told Relator "we [Sava] are in the business of making money." Relator did not have any further contact from anyone with Sava relating to her concerns that she raised in the April 5, 2011 e-mail, and operations at the Woodwind Lakes continued without change, at Sava's direction.

355.    In the meantime, Administrator McArthur moved Relator's office to another part of the facility, separating her from the rest of the staff. Relator believes this was done in response to her e-mail and report regarding the patient's death, in order to keep her from discussing her concerns with the rest of the staff and to quell any influence Kukoyi may have that would result in the staff no longer following McArthur's fraudulent directions.

356.    On Tuesday, April 26, 2011, Texas DADs surveyors arrived unannounced to perform a "full book survey." This is the bi-annual survey of the entire facility's operations. DADs does not inform the facility when the survey will occur so as to best assess the care

provided and the operations of the facility. A "full book survey" is a survey of the entire facility to determine whether the facility is providing care and operating in compliance with the federal and state laws, rules, regulations and codes. As noted earlier, Relator Kukoyi performed these surveys when she was employed by DADs.

357. Kukoyi reported to work on April 26, 2011, at her usual start time of 8:00 a.m. She learned then that the survey was taking place. As the licensed social worker for Sava, Kukoyi was expected to participate in the survey, providing surveyors with access to records and answers to any questions. She was doing so when, at 10:30 a.m., Administrator McArthur called Relator and told her to report to the Human Resources Department. Jenine Dumas, Coordinator of the Human Resources Department, told Kukoyi she did not know what was going on or why Kukoyi was in her office.

358. Administrator McArthur came to the office and told Kukoyi she was suspended immediately until further investigation for an incident that occurred the previous Thursday on April 21, 2011. McArthur stated that Kukoyi had verbally abused a patient and that Kukoyi needed to leave the building immediately. Kukoyi left the building as directed.

359. Upon her return to her home, Kukoyi called the Texas State Board of Social Worker Examiners. This agency regulates the profession of social workers in Texas. Even though Kukoyi did not agree with McArthur's allegations that Kukoyi verbally abused a particular resident on Thursday, April 21, 2011, she nonetheless self-reported the allegations.

360. Kukoyi did not understand why McArthur waited until the following Tuesday, April, 26, 2011, to suspend her for an incident that took place the previous Thursday. Kukoyi suspected that McArthur was afraid that Kukoyi would relate to surveyors her concerns regarding the care of patients and operations of the facility, as noted in Kukoyi's April 5, 2011

report to the DADs. Kukoyi further suspected that McArthur used the allegations as a ruse to have Kukoyi out of the facility during the survey. Kukoyi knew that she was being retaliated against for sending her e-mail on April 5, 2011. In the evening of April 26, 2011, Relator called Bob Kaylan, Sava's Corporate Regional Manager for Nursing Home Administrators for Sava, to discuss her suspension and relay her concerns again regarding the operations of the facility. Mr. Kaylan had already heard about the incident and told Kukoyi that they were investigating a "complaint" from a family member. Kukoyi realized that the incident had only been reported to Mr. Kaylan as a complaint rather than an incident of verbal abuse as McArthur had reported to Kukoyi. An incident of verbal abuse warrants a report to the state's social workers' licensing board. Such a report usually instigates an investigation into the incident and could have negative repercussions on the social workers' license. In contrast, a complaint is usually looked into by the Nursing Home Administrator without any referral to the licensing board. Kukoyi, still relatively newly licensed, was confused and concerned as to the actual categorization of the incident.

361. In response to the confusion as to whether the incident was a complaint or an allegation of verbal abuse, Kukoyi told Mr. Kaylan that she felt she needed a lawyer. Mr. Kaylan responded that if she chose to get a lawyer, then she should have the attorney contact the Sava attorney and added, "We don't need to talk." He then ended the telephone call.

362. Relator next heard from Sava on Friday, April 29, 2011, at 9:30 a.m., when the Director of Nursing, Josephine Girandi, called Relator on her cell phone to discuss the alleged incident of verbal abuse. Girandi told Kukoyi that she was investigating the incident. When Kukoyi stated she was not comfortable discussing the incident without her lawyer, Girandi ended the telephone call.

363.    Administrator Angela McArthur contacted Kukoyi at 11:15 a.m. on Friday, April 29, 2011, to discuss the alleged incident of verbal abuse.  Again Kukoyi stated she would prefer to have her lawyer present during any discussion.  McArthur ended the telephone conversation.

364.    That evening at 7:54 p.m., McArthur called Relator again and informed her, per corporate instructions, that Kukoyi was immediately terminated for not cooperating with Sava's investigation.  Kukoyi's prediction in her April 5, 2011 e-mail wherein she stated she knew she would be fired for coming forward thus came to fruition.

365.    Kukoyi also made anonymous reports to the FBI and the Office of the Inspector General through CMS's hotline in Baltimore, Maryland, and DADs regarding the patient's death. On April 6, 2011, Texas's Department of Aging and Disability, the agency responsible for the regulation of long-term care facilities in Texas, came to Woodwind Lakes' facility to investigate her report and substantiated that the facility had failed to report the death of the resident.

## VIII.   ACTIONABLE CONDUCT BY DEFENDANTS UNDER FALSE CLAIMS ACT

### A.   Applicable Law

#### 1.   The False Claims Act

366.    This is an action to recover damages and civil penalties on behalf of the United States and Kukoyi arising from the false or fraudulent statements, claims, and acts by Sava made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

367.    For conduct occurring before May 20, 2009, the False Claims Act ("FCA") provides in pertinent part that:

> a.  Any person who
>
>> 1. knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

92

2. knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

3. conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

\*\*\*

(7)     knowingly makes, uses or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government

is liable to the Government for a civil penalty of not less than $5, 500 and not more than $11,000 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claims.  31 U.S.C. § 3729(a).  The FCA defined "claim" at that time to include: "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C 3729(c).

368.     For conduct occurring on or after May 20, 2009, the FCA provides that any person who:

(a)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (except that this language applies to all claims pending on or after June 7, 2008);

(c)     conspires to defraud the Government by committing a violation of the FCA;

(d)     knowingly makes, uses, or causes to be made or used, a false record or statement to conceal material to an obligation to pay or transmit money or property to the Government

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000

for each such claim, plus three times the amount of damages sustained by the Government

because of the false or fraudulent claim. 31 U.S.C. § 3729(a)(1).

369.    The amended FCA defines "claim" as:

(A) mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . .

370.    The FCA allows any persons having knowledge of a false or fraudulent claim

against the Government to bring an action in Federal District Court for themselves and for the

United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730.

371.    Based on these provisions, Relator Kukoyi, on behalf of the United States

Government and the States of California, Colorado, Connecticut, Georgia, Illinois, Maryland,

Massachusetts, Michigan, North Carolina, Tennessee, Texas, and Wisconsin seeks through this

action to recover damages and civil penalties arising from Sava's causation of the submission of

false claims to the federal and state governments. In this case, such claims were submitted to the

federal and state governments for payment of skilled nursing care services that were not

medically necessary or never provided. Relator Kukoyi believes that the United States has

suffered significant damages.

94

372.    There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative Relator Kukoyi is an original source as defined therein.  To the extent that any allegations or transactions herein have been publicly disclosed, Relator Kukoyi has direct knowledge that is independent of and materially adds to the information on which the allegations are based.  As required pursuant to 31 U.S.C. §§ 3730(b) and (e), Relator Kukoyi has voluntarily provided information, oral and/or written, and have sent disclosure statement(s) of all material evidence, information and documents related to her Original Complaint, both before and contemporaneously with filing, to the Attorney General of the United States, the United States Attorney for the Southern District of Texas, and the states' Attorneys General.  She has since supplemented her disclosures to the United States and the Qui Tam States in an appropriate manner.  All real parties in interest have been served.

**B.**    **Defendants' Violations of the FCA**

**1.**    **Defendants' Scheme to Fraudulently Bill Medicare Part A, Medicaid and TRICARE/CHAMPUS/CHAMPVA and Provisions of Kickbacks Violate the FCA former 31 U.S.C. § 3729(a)(1); current 31 U.S.C. § 3729(a)(1)(A)**

373.    The Defendants knowingly presented or caused to be presented false or fraudulent claims for reimbursement (i.e., for payment or approval) to the United States for the provision of unnecessary medical services, billing for services not provided or for services that were not medically necessary and by violating patients' rights under 42 C.FR. Part 483 Subpart B.  Other fraudulent schemes included improper upcoding, illegal referrals and offers and acceptance of illegal remuneration.  Each time the Affiliate Facilities, at Sava's direction, filed or caused to be filed with Medicaid claims for services that were not performed or that were not medically necessary or that were tainted by kickbacks, they violated the certifications incorporated into

those claims, the truth of which was a condition of payment. Further, each of these providers filed cost reports with Medicare and Medicaid certifying, for instance, that services provided were in compliance with the law. Finally, in applying for enrollment with Medicare and Medicaid, the Affiliate Facilities misrepresented that they would adhere to the law, as alleged more fully above. By creating and carrying out these fraudulent schemes and presenting or causing to be presented resultant claims that were false because of false certifications and on their face, the Defendants repeatedly and with continued knowledge violated the False Claims Act, § 3729(a)(1).

374.    Sava, the Affiliated Facilities, and Woodwind Lakes knowingly caused to be presented false or fraudulent claims (i.e., for payment or approval) to Medicare Part A, Medicaid and CHAMPUS/CHAMPVA for reimbursement of the provision of unnecessary medical services or services that were not provided and by violating patients' rights under 42 C.FR. Part 483 Subpart B. By creating and carrying out this fraudulent scheme, Sava, the Affiliated Facilities, and Woodwind Lakes repeatedly and with continued knowledge violated the False Claims Act § 31 3729(a)(1).

375.    Moreover, Sava, the Affiliated Facilities, and Woodwind Lakes knowingly caused to be presented false or fraudulent claims (i.e., for payment or approval) to Medicare Part A, Medicaid and CHAMPUS/CHAMPVA, for the fraudulent billing of patient services that did not meet medically necessity standards. By creating and carrying out this fraudulent scheme, Sava, the Affiliated Facilities, and Woodwind Lakes repeatedly and with continued knowledge violated the False Claims Act, 31 U.S.C. § 3729(a)(1).

376. Sava violated the Anti-Kickback statute when it provided bonuses to its employees based on their ability to maintain patient census and the quarterly amount that was billed to Medicare Part A.

377. Kickback-tainted claims are non-reimbursable because compliance with the Anti-Kickback statute is a condition of payment of any claims submitted for payment to federal healthcare programs, including Medicare Part A, Medicaid and TRICARE/CHAMPUS/CHAMPVA. Furthermore, claims resulting from a kickback scheme are inherently false or fraudulent, as the claims are the product of false or fraudulent conduct.

378. Given the structure of the health care systems at issue, Sava, the Affiliated Facilities, and Woodwind Lakes' false statements and representations, and the false records that Sava, the Affiliated Facilities, and Woodwind Lakes made, used, or caused to make or use, has the potential to influence the governments' payment decision.

379. The ultimate submission by Sava, the Affiliated Facilities, and Woodwind Lakes of false and fraudulent claims to Medicare Part A, the state Medicaid programs, and/or TRICARE/CHAMPUS/CHAMPVA, was a foreseeable factor in the governments' loss, and a consequence of the schemes. Consequently, the States of California, Colorado, Connecticut, Georgia, Illinois, Massachusetts, Maryland, Michigan, North Carolina, Tennessee, Texas, and Wisconsin, and the United States Government have suffered substantial damages.

**2.      Defendants' Scheme to Fraudulently Bill Medicare Part A, Medicaid, and TRICARE/CHAMPUS/CHAMPVA Violates former 31 U.S.C. § 3729(a)(2); current 31 U.S.C. § 3729(a)(1)(B)**

380. The Defendants knowingly made, used or caused to be made or used, false records or statements, or omitted material facts (a) to get false or fraudulent claims paid or approved by the Government, or (b) that were material to false or fraudulent claims in violations

of 31 U.S.C. §3729(a) through the provision of medically unnecessary services, or not providing medical services at all; the false and fraudulently use of the RUG "RUX to improperly inflate the Medicare Part A reimbursements; the use of false and fraudulent Minimum Data sets which resulted in higher RUG rates and Medicare Part A reimbursement and the use of a bonus structure in order to maintains submission of claims.

381.    Defendants Sava, the Affiliated Facilities, and Woodwind Lakes knowingly made, used, or caused to be made or used, false records or statements in order to cause false or fraudulent claims to be paid or approved by the United States.  These false statements or records consist of false certifications or representations made or caused to be made by Sava, the Affiliated Facilities, and/or Woodwind Lakes to Medicare Part A, state Medicaid programs and TRICARE/CHAMPUS/CHAMPVA when seeking to participate in the various government programs.  Each time the Affiliate Facilities, at Sava's direction, filed or caused to be filed with Medicaid claims for services that were not performed or that were not medically necessary or that were tainted by kickbacks, they violated the certifications incorporated into those claims, the truth of which was a condition of payment.  Further, each of these providers filed cost reports with Medicare and Medicaid certifying, for instance, that services provided were in compliance with the law.  Finally, in applying for enrollment with Medicare and Medicaid, the Affiliate Facilities misrepresented that they would adhere to the law, as alleged more fully above. By creating and carrying out these fraudulent schemes and presenting or causing to be presented resultant claims that were false because of false certifications and on their face,

382.    More specifically, Sava, the Affiliated Facilities, and/or Woodwind Lakes made or caused to be made express certifications in Medicare and State Medicaid provider enrollment forms that they would comply with all federal and state law applicable to Medicare and

Medicaid. These certifications were false and Sava knew it at the time. Physicians, pharmacies, and pharmacists make express and/or implied certifications in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid. Compliance with federal and state laws and regulations was a condition of payment.

383. Additionally, Sava, the Affiliated Facilities, and/or Woodwind Lakes knowingly made or caused to be made false representations regarding the medical services that were provided that were not considered medically necessary and in some instances were never provided.

384. Moreover, Sava, the Affiliated Facilities, and/or Woodwind Lakes knowingly made or caused to be made false representation in the Minimum Data Sets required for each patient resulting in higher Medicare Part A reimbursement rates. Sava instructed its medically coding staff to use inflated RUG rates, such as "RUX" – when the patients' condition did not warrant such RUG rates, with the intent of receiving higher reimbursement rates.

385. Given the structure of the health care systems, and given the nature of Sava's, the Affiliated Facilities' and/or Woodwind Lakes' false and/or fraudulent statements, representations, and records, these false and/or fraudulent statements, representations, and/or false records, had the potential to influence the government's payment decision.

386. The ultimate submission by Sava, the Affiliated Facilities and/or Woodwind Lakes of false claims to Medicare, Medicaid, and TRICARE/CHAMPUS/CHAPMUSVA was a foreseeable factor in the government's loss, and a consequence of the scheme. Consequently, the States of California, Colorado, Connecticut, Georgia, Illinois, Massachusetts, Maryland, Michigan, North Carolina, Tennessee, Texas, and Wisconsin and the United States Government have suffered substantial damages.

**3.    Defendants' Conspiracy to Defraud the Government in Violation of FCA former 31 U.S.C. § 3729(a)(3); current 31 U.S.C. § 37299a)(1)(C)**

387.    The Defendants conspired with one another to submit false claims for reimbursement of the unnecessary medical procedures services and/or pharmaceuticals, they provided and for the improper billing procedures, illegal referrals and offers and acceptance of illegal remuneration.

388.    Sava, the Affiliated Facilities, and Woodwind Lakes conspired with one another to submit false claims for reimbursement of skilled nursing care services. Sava understood that the facilities were submitting false and fraudulent claims for reimbursement that arose out of services not rendered or false reports that patients were qualified for skilled nursing care under Medicare Part A. The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Sava and condoned by Sava. Sava knew that falsifying the Minimum Data Set and using the RUG rate "RUX" would result in higher reimbursement rates from Medicare Part A, Medicaid and CHAMPUS/CHAMPVA, even though the services did not meet the medical necessity standards. Furthermore Sava structured its employees' bonuses based on the amount billed to Medicare and maintaining patient census. Sava incentivized its employees to fraudulently increase the claims submitted to the Medicare program.

389.    Given the structure of the health care systems at issue, and given Defendants' conspiracy, Defendants' conduct has the potential to influence the government's payment decision.

390.    The ultimate submission by Sava, the Affiliated Facilities and/or Woodwind Lakes of false claims to Medicare Part A, the state Medicaid programs and CHAMPUS/CHAMPVA was a foreseeable factor in the Government's loss and a consequence

of the scheme. Consequently, the States of California, Colorado, Connecticut, Georgia, Illinois, Maryland, Massachusetts, Michigan, North Carolina, Tennessee, Texas, and Wisconsin and the United States Government have suffered substantial damages.

### 4. Sava and Woodwind Lakes Retaliated Against Kukoyi in Violation of the FCA 31 U.S.C. 3730(h)

391. Sava and Woodwind Lakes took negative employment action against Kukoyi in response to her questioning of the legality and ethics of the schemes perpetrated by Sava as explained above. Sava and Woodwind Lakes terminated her employment on April 26, 2011. Because of Sava's and Woodwind Lake's conduct, Kukoyi suffered negative employment consequences such as prolonged unemployment and its associated economic losses and damages.

## IX. CAUSES OF ACTION

### A. COUNT I – FALSE CLAIMS (former 31 U.S.C. § 3729(a)(1); current 31 U.S.C. § 3729(a)(1)(A))

392. Relator realleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

393. As a result of Sava's, Woodwind Lakes and the Affiliated Associates' schemes, all invoices for Medicare Part A, Medicaid and TRICARE/CHAMPUS/CHAMPVA constitute false and/or fraudulent claims. Furthermore, Sava, Woodwind Lakes and the Affiliated Associates knowingly caused to be presented false and/or fraudulent claims for unnecessary medical services or services that were not provided; for services that did not meet medically necessary standards; for violating patients' rights under 42 C.F.R. Part 483 Subpart B and for claims that violated the Anti-Kickback Statute for maintaining high patient census. The claims were false on their face and/or were the subject of false certifications. Sava, Woodwind Lakes

and Affiliated Associates knowingly caused such false or fraudulent claims to be presented for payment or approval, in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A)).

394.    The United States paid the false and/or fraudulent claims.

395.    By virtue of the false or fraudulent claims that Sava, Woodwind Lakes, and Affiliated Associates knowingly presented or caused to be presented, the United States government has suffered substantial monetary damages.

## B.    COUNT II – FALSE RECORDS OR STATEMENTS (31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))

396.    Relator realleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

397.    As a result of Sava, Woodwind Lakes and the Affiliated Facilities provision of medically unnecessary services, or not providing medical services at all; the false and fraudulently use of the RUG "RUX to improperly inflate the Medicare Part A reimbursements; the use of false and fraudulent Minimum Data sets which resulted in higher RUG rates and Medicare Part A reimbursement and the use of a bonus structure in order to maintains submission of claims Sava, Woodwind Lakes and the Affiliated Facilities knowingly and with specific intent made or used or caused to be made or used false records or statements, and omitted material facts (a) to get false or fraudulent claims paid or approved by the Government, or (b) that were material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a); 31 U.S.C. § 3729(a)(1)(B).   These false statements or records consist of false certifications or representations made or caused to be made by Sava, Woodwind Lakes and the Affiliated Facilities to the state Medicaid programs when seeking to participate in the various programs.

398.  By virtue of the false records or statements that Sava, Woodwind Lakes or the Affiliated Facilities made or used, the United States government has suffered substantial monetary damages.

**C.  COUNT III. - CONSPIRACY TO COMMIT FRAUD (31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(a)(1)(C))**

399.  Relator realleges and hereby incorporates by reference each and every allegation contained in the proceeding paragraphs of this Complaint.

400.  Sava, the Affiliated Facilities, and Woodwind Lakes conspired with one another by entering into agreements to submit false claims for reimbursement of skilled nursing care services including claims that arose out of services not rendered or false reports that patients were qualified for skilled nursing care under Medicare Part A, and falsifying the Minimum Data Set and using the RUG rate "RUX" that resulted in higher reimbursement rates from Medicare Part A, Medicaid and TRICARE/CHAMPUS/CHAMPVA, even though the services did not meet the medical necessity standards.

401.  By virtue of the false and/or fraudulent claims submitted, paid, or approved as a result of the Defendant's conspiracy to defraud the Government, the United States has suffered substantial monetary damages.

**D.  COUNT IV. – FALSE RETALIATION (31 U.S.C. § 3730 (h))**

402.  Relator realleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

403.  In violations of the False Claims Act § 3730(h), Sava and Woodwind Lakes terminated Relator's employment in response to her reporting to Sava and various state and federal regulatory agencies the possible fraudulent actions taken by Sava and Woodwind Lakes

Case 3:15-cv-01102   Document 40-2   Filed 07/30/15   Page 28 of 40 PageID #: 488

that violated the conditions of payment under the Medicare, Medicaid and CHAMPUS/CHAMPVA programs.

404. As a result of Sava's and Woodwind Lakes' termination of Relator's employment, Relator has suffered negative employment consequences such as prolonged unemployment and its associated economic losses and damages.

## RELIEF

405. On behalf of the United States Government, the *qui tam* Relator seeks to receive monetary damages equal to three times that suffered by the United States Government. In addition, the *qui tam* Relator seeks to receive all civil penalties on behalf of the United States Government in accordance with the False Claims Act.

406. *Qui tam* Relator seeks to receive, on her own behalf, damages including reinstatement with the same seniority status, two times the amount of back pay, interest on the back pay, pre-judgment interest, and compensation for any special damages sustained as a result of the discrimination including litigation costs and reasonable attorneys' fees, that she is entitled to for Omnicare's retaliatory conduct against her. In addition, Relator seeks punitive damages on her own behalf. Special damages also include, but are not limited to, compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss to reputation and other pecuniary and nonpecuniary losses.

407. The *qui tam* Relator seeks to be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

408. The *qui tam* Relator seeks to be awarded all costs and expenses for this action, including attorneys' fees and court costs.

## PRAYER

WHEREFORE, Relator prays that this Court enter judgment on behalf of the Relator and against Sava, Woodwind Lakes and Associated Facilities for the following:

a. Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of Defendants' conduct;

b. Civil penalties against Defendants' equal to $11,000 for each violation of 31 U.S.C. § 3729;

c. The maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d. All costs and expenses of this litigation, including attorneys' fees and costs of court;

e. Relator's individual damages as described in Relief section, above;

f. Pre-judgment interest at the highest rate allowed by law; and

g. All other relief on behalf of Relator or the United States Government to which they may be entitled and that the Court deems just and proper.

## E. COUNT V. - CALIFORNIA FALSE CLAIMS ACT

409. Relator repeats and realleges each allegation contained in the preceding paragraphs of this Complaint.

410. This is a *qui tam* action brought by Relator and the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq*.

411. Cal. Gov't Code § 12651(a) provides liability for any person who-

(1) knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof, a false claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3) conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

\*\*\*

(7)     knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision.

412.   In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code §§ 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code § 14107.2.

413.   Defendants have knowingly violated Cal. Gov't Code § 12651(a) from at least 2005 to the present by violating the Federal Anti-Kickback Statute and the California Anti-Kickback Statutes (Cal. Bus. & Prof. Code §§ 650 – 650.1 and Cal. Welf. & Inst. Code § 14107.2) as described herein.

414.   The following Associated Facilities are located in California: SSC San Jose Operating Company, L.P. d/b/a Courtyard Care Center; SSC Pittsburg Operating Company, L.P. d/b/a Diamond Ridge HealthCare Center; SSC Oakland Excell Operating Company, L.P. d/b/a Excell Health Care Center; SSC Newport Beach Operating Company, L.P. d/b/a Flagship Healthcare Center; SSC Oakland Fruitvale Operating Company, L.P. d/b/a Fruitvale Health Care Center; SSC Carmichael Operating Company, L.P. d/b/a Mission Carmichael HealthCare Center; and SSC Tarzana Operating Company, L.P. d/b/a Tarzana Health and Rehabilitation Center.

415.   Sava, Woodwind Lakes, and the Associated Facilities located in California have schemed to (1) create false and/or fraudulent Minimum Data Sets that resulted in correspondingly false and/or fraudulent RUG rates and therefore in higher Medicare reimbursement, (2) fraudulently submit claims for services that were not medically necessary or never provided, some or all of which claims arise out of medical records altered in order to maintain billing under Medicare Part A for patients no longer requiring skilled nursing care; (3) pay employee bonuses based on the Medicare reimbursement and census numbers; (4) violate

patients' rights under 42 C.F.R. Part 483 Subpart B and (5) return Medicare and Medicaid patients' pharmaceuticals to Omnicare for facility credit upon the patients' discharge. Sava, Woodwind Lakes and the Associated Facilities located in California, as listed above, knowingly submitted or caused to be submitted to the California Medicaid programs and other state health care programs such false and/or fraudulent claims. Additionally, Sava, Woodwind Lakes and the Associated Facilities located in California, as listed above, falsely certified, expressly and/or impliedly, and represented full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute and the California Anti-Kickback Statutes (Cal. Bus. & Prof. Code §§ 650 – 650.1 and Cal. Welf. & Inst. Code § 14107.2). Compliance with federal and state laws and regulations is a condition of payment.

416. The State of California, by and through California Medicaid programs and other state health care programs, paid the false and/or fraudulent claims.

417. Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of California's payment decision.

418. The ultimate submission by Sava, Woodwind Lakes and the Affiliated Facilities located in California, as listed above, of false claims to the state programs was a foreseeable factor in the State of California's loss, and a consequence of the scheme.

419. As a result of the Defendants' violations of Cal. Gov't Code §12651(a), the State of California has been damaged.

420. There are no bars to recovery under Cal. Gov't Code §12652(d)(3), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with

direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of herself and the State of California.

421. This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF CALIFORNIA:

(1) Three times the amount of actual damages that the State of California has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2) A civil penalty of up to $11,000 for each false claim that the Defendants presented or caused to be presented to the State of California;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR KUKOYI:

(1) The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## F. COUNT VI–COLORADO FALSE CLAIMS ACT

422. Relator repeats and realleges each allegation contained in the preceding paragraphs of this Complaint.

423.    This is a *qui tam* action brought by Relator and the State of Colorado to recover treble damages and civil penalties under the Colorado False Claims Act, Col. Rev. Stat. Ann. § 25.5-4-304 *et seq.*

424.    Col. Rev. Stat. Ann. §25.5-4-305 provides liability for any person who

    1.    knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

    2.    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

    3.    conspires to commit a violation of §25.5-4-305;

    4.    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of Colorado, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State of Colorado.

425.    Defendants have knowingly violated Col. Rev. Stats. Ann §25.5-4-305 from at least 2005 to the present by violating the Federal Anti-Kickback Statute as described herein.

426.    The following Associated Facilities are located in Colorado: SSC Thornton Operating Company, L.L.C. d/b/a/ Alpine Living Center; SSC Longmont Operation Company, L.L.C.; SSC Colorado Springs Aspen Operating Company, L.L.C. d/b/a Aspen Living Center; SSC Pueblo Belmont Operating Company, L.L.C. d/b/SSC a Belmont Lodge Health Care Center; SSC Berthoud Operating Company, L.L.C. d/b/a Berthoud Living Center; SSC Boulder Operating Company, L.L.C. d/b/a Boulder Manor; SSC Colorado Springs Cedarwood Operating Company L.L.C. d/b/a Cedarwood Health Care Center; SSC Greeley Center; Centennial Operating Company, L.L.C. d/b/a Centennial Healthcare Center; SSC Colorado Springs Colonial Columns Operating Company, L.L.C. d/b/a Colonial Columns Nursing Center; SSC Fort Collins Lemay Avenue Operating Company, L.L.C. d/b/a Fort Collins Health Care Center; SSC Durango Operating Company, L.L.C. d/b/a Four Corners Health Care Center; SSC Fort Collins Spring

109

Creek Operating Company, L.L.C. d/b/a Garden Square at Spring Creek; SSC Denver Red Rocks Operating Company, L.L.C. d/b/a Jewell Care Center of Denver; SSC Greeley Kenton Operating Company, L.L.C. d/b/a Kenton Manor SSC Pueblo Operating Company, L.L.C. d/b/a Minnequa Medicenter; SSC Denver South Monaco Operating Company, L.L.C. d/b/a Monaco Parkway Health and Rehabilitation Center; SSC Palisade Operating Company, L.L.C. d/b/a Palisades Living Center; SSC Englewood Operating Company, L.L.C. d/b/a Pearl Street Health and Rehabilitation Center; SSC Montrose San Juan Operating Company, L.L.C. d/b/a San Juan Living Center; SSC Loveland Operating Company, L.L.C. d/b/a Sierra Vista Health Care Center; SSC Fort Collins Spring Creek Operating Company, L.L.C. d/b/a Spring Creek Health Care Center; SSC Sterling Operating Company, L.L.C. d/b/a Sterling Living Center; SSC Brush Sunset Manor Operating Company, L.L.C. d/b/a Sunset Manor; SSC Colorado Springs Terrace Gardens Operating Company, L.L.C. d/b/a Terrace Gardens Healthcare Center; SSC Windsor Operating Company, L.L.C. d/b/a Windsor Healthcare Center, and SSC Yuma Operating Company, L.L.C. d./b/a Yuma Life Center.

427. Sava, Woodwind Lakes, and the Associated Facilities located in Colorado have schemed to (1) create false and/or fraudulent Minimum Data Sets that resulted in correspondingly false and/or fraudulent RUG rates and therefore in higher Medicare reimbursement, (2) fraudulently submit claims for services that were not medically necessary or never provided, some or all of which claims arise out of medical records altered in order to maintain billing under Medicare Part A for patients no longer requiring skilled nursing care; (3) pay employee bonuses based on the Medicare reimbursement and census numbers; (4) violate patients' rights under 42 C.F.R. Part 483 Subpart B, and (5) return Medicare and Medicaid patients' pharmaceuticals to Omnicare for facility credit upon the patients' discharge. Sava,

Woodwind Lakes and the Associated Facilities located in Colorado, as listed above, knowingly submitted or caused to be submitted to the Colorado Medicaid programs and other state health care programs such false and/or fraudulent claims. Sava, Woodwind Lakes and the Associated Facilities located in Colorado, as listed above, knowingly caused false and or fraudulent claims to be submitted to the Colorado Medicaid programs and other state health care programs.

428. Additionally, Sava, Woodwind Lakes and the Associated Facilities located in Colorado, as listed above, falsely certified, expressly and/or impliedly and represented full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute. Compliance with federal and state laws and regulations is a condition of payment.

429. The State of Colorado, by and through the Colorado Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

430. Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Colorado's payment decision.

431. The ultimate submission by Sava, Woodwind Lakes and the Affiliated Facilities located in Colorado, as listed above, of false claims to the state programs was a foreseeable factor in the State of Colorado's loss, and a consequence of the scheme.

432. As a result of the Defendants' violations of Col. Rev. Stat. Ann. §25.5-4-305, the State of Colorado has been damaged.

433. There are no bars to recovery under Col. Rev. Stat. Ann. §25.5-4-306, and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this

action pursuant to Col. Rev. Stat. Ann. §25.5-4-306(2) on behalf of herself and the State of Colorado.

434.    This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Colorado in the operation of its state programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF COLORADO:

(1)    Three times the amount of actual damages that the State of Colorado has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of up to $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Colorado;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR KUKOYI:

(1)    The maximum amount allowed pursuant to Col. Rev. Stat. Ann. §25.5-4-306 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

G.    COUNT VII – CONNECTICUT ACT IMPLEMENTING THE PROVISIONS OF THE BUDGET CONCERNING HUMAN SERVICES AND MAKING CHANGES TO VARIOUS SOCIAL SERVICES STATUTES

435.    Relator repeats and realleges each allegation contained in the preceding paragraphs of this Complaint.

436.     This is a *qui tam* action brought by Relator and the State of Connecticut to recover treble damages and civil penalties under the Connecticut Act Implementing the Provisions of the Budget Concerning Human Services and Making Changes to Various Social Services Statutes, Conn. Gen. Stat. 17b-301a *et seq*.

437.     Conn. Gen. Stat. 17b-301b(a) provides liability for any person who

(a)     knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval under medical assistance programs administered by the Department of Social Services;

(b)     knowingly makes, uses or causes to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under medical assistance programs administered by the Department of Social Services;

(c)     conspires to defraud the state by securing the allowance or payment of a false or fraudulent claim under medical assistance programs administered by the Department of Social Services;

(d)     knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state under medical assistance programs administered by the Department of Social Services.

438.     Defendants have knowingly violated Conn. Gen. Stat. 17b-301b(a) from at least 2005 to the present by violating the Federal Anti-Kickback Statute and the Connecticut laws prohibiting kickback (Conn., Gen Stat. §§ 53a-161c, 53a-161d), as described herein.

439.     The following Associated Facilities are located in Connecticut: SSC Niantic Operating Company, L.L.C. d/b/a Bride Brook Health and Rehabilitation Center, and SSC Mystic Operating Company, L.L.C. d/b/a Pendleton Health and Rehabilitation Center.

440.     Sava, Woodwind Lakes, and the Associated Facilities located in Connecticut have schemed to (1) create false and/or fraudulent Minimum Data Sets that resulted in correspondingly false and/or fraudulent RUG rates and therefore in higher Medicare

113

reimbursement, (2) fraudulently submit claims for services that were not medically necessary or never provided, some or all of which claims arise out of medical records altered in order to maintain billing under Medicare Part A for patients no longer requiring skilled nursing care; (3) pay employee bonuses based on the Medicare reimbursement and census numbers; (4) violate patients' rights under 42 C.F.R. Part 483 Subpart B and (5) return Medicare and Medicaid patients' pharmaceuticals to Omnicare for facility credit upon the patients' discharge. Sava, Woodwind Lakes and the Associated Facilities located in Connecticut, as listed above, knowingly submitted or caused to be submitted to the Connecticut Medicaid programs and other state health care programs such false and/or fraudulent claims.

441. Additionally, Sava, Woodwind Lakes and the Associated Facilities located in Connecticut, as listed above, falsely certified, expressly and/or impliedly and represented full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the Federal Anti-Kickback Statute and the Connecticut laws prohibiting kickbacks. (Conn., Gen Stat. §§ 53a-161c, 53a-161d). Compliance with federal and state laws and regulations is a condition of payment.

442. The State of Connecticut, by and through the medical assistance programs administered by the Connecticut Department of Social Services, paid the false and/or fraudulent claims.

443. Given the structure of the health care systems, the false statements, representations, and/or records made by the Defendants had the potential to influence the State of Connecticut's payment decision.

444. The ultimate submission by Sava, Woodwind Lakes and the Affiliated Facilities located in Connecticut, as listed above, of false claims to the state programs was a foreseeable factor in the State of Connecticut's loss, and a consequence of the scheme.

445. As a result of the Defendants' violations of Conn. Gen. Stat. § 17-301b(a), the State of Connecticut has been damaged.

446. There are no bars to recovery under Conn. Gen. Stat. § 17-301i(a), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Conn. Gen. Stat. § 17-301i(a) on behalf of herself and the State of Connecticut.

447. This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Connecticut in the operation of the medical assistance programs administered by the Connecticut Department of Social Services.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF CONNECTICUT:

(1) Three times the amount of actual damages that the State of Connecticut has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2) A civil penalty of up to $10,000 for each false claim that the Defendants presented or caused to be presented to the State of Connecticut;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR KUKOYI: